IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEAGAN GLEASON,

                Plaintiff,

      v.

FILTER HOLDINGS, LLC, a Washington
Limited Liability Company d/b/a FILTER, A
MERKLE COMPANY; DENTSU UK
LIMITED; DENTSU AEGIS NETWORK US
HOLDINGS,

                Defendants.

Case No. 3:21-cv-01862-SB

**OPINION AND ORDER**

**BECKERMAN, U.S. Magistrate Judge.**

Plaintiff Meagan Gleason ("Gleason") alleges violations of the Equal Pay Act ("EPA"),

Title VII of the Civil Rights Act of 1964 ("Title VII"), and discriminatory wage rates, retaliation,

and failure to pay wages upon termination under state law against Filter Holdings, LLC

("Filter"), Dentsu UK Limited ("Dentsu UK"), and Dentsu Aegis Network US Holdings

("Dentsu") (together, "Defendants").

Now before the Court are Gleason's motion for partial summary judgment (ECF No. 66)

and Defendants' motion for summary judgment (ECF No. 69). The Court has jurisdiction over

PAGE 1 – OPINION AND ORDER

Gleason's claims pursuant to 28 U.S.C. §§ 1331 and 1367, and all parties have consented to the

jurisdiction of a magistrate judge under 28 U.S.C. § 636. For the reasons that follow, the Court

denies Gleason's motion for partial summary judgment and grants in part and denies in part

Defendants' motion for summary judgment.

## BACKGROUND

Gleason alleges claims of wage discrimination, retaliation, and failure to pay wages upon

termination in this action against her former employer. (*See generally* Sec. Amended Compl.

("SAC"), ECF No. 39.)

## I.    CONTEXT

It is undisputed that at all relevant times Filter, Gleason's former employer, provided in-

house staffing solutions, data analytics, and marketing research to its clients. (*Id.* ¶ 11.) Filter's

two main branches of client-facing services were sales and delivery. (*See* Dep. Meagan Gleason

("First Gleason Dep.") 62:3-20, May 4, 2023.)[1] Sales, or "growth," was responsible for revenue

and new opportunities such as securing new contracts, new clients, and new scopes of work until

a client signed a contract. (*Id.* at 63:7-64:8.) After a client signed a contract, delivery was

responsible for the day-to-day execution of the scope of work in the contract. (*Id.* at 64:3-10.)

Nike was one of Filter's largest clients. (*See* Dep. Joe Melanson ("Melanson Dep.") 39:9-

16.)[2] From 2016 to 2018, before Filter hired Gleason, an employee named Jim Dodson

("Dodson") worked for Filter in the Portland area in the role of "Client Partner," largely working

---

[1] Excerpts of Gleason's first deposition transcript are available at Decl. Stephan Kendall Supp. Defs.' Mot. Summ. J. ("Kendall Decl.") Ex. 1, ECF No. 70-1, and Decl. Stephan Kendall Supp. Defs.' Reply Pl.'s Resp. ("Third Kendall Decl.") Ex. 1, ECF No. 95-1.

[2] Excerpts of Melanson's deposition transcript are available at Kendall Decl. Ex. 11, ECF No. 70-11, and Decl. Byron Goldstein Supp. Pl.'s Opp. Defs.' Mot. Summ. J. ("Goldstein Decl.") Ex. G, ECF No. 90.

with Nike. (U.S. Equal Employment Opportunity Commission ("EEOC") Decl. Don Olson

("Olson EEOC Decl.") ¶ 4, ECF No. 82; Dep. Terry Harnisch ("Harnisch Dep.") 58:23-59:17.)[3]

Client Partners worked in sales and were responsible for new business development, account

management, and driving growth. (*See* Decl. Terry Harnisch Supp. Defs.' Mot. Summ. J.

("Harnisch Decl.") Ex. 4 at 1, ECF No. 72-4; First Gleason Dep. 63:14-16.) Throughout his

career at Filter, Dodson earned an annual salary of $130,000. (*See* Goldstein Decl. Exs. C-F,

ECF No. 91; Answer ¶ 13, ECF No. 47.) As a Client Partner, Dodson also earned (1) four

percent of gross profit in commission for all contract, contract-to-hire, direct-hire placements,

and managed team services engagements begun after his assignment to an account, and (2) two

percent of gross profit *growth* in commission over the same month of the prior year. (Goldstein

Decl. Exs. D-F; *see also* Harnisch Dep. 58:5-19, discussing the four percent gross profit

commission.) Dodson was the only Client Partner in Oregon at the time, although Filter

employed other Client Partners. (*See* Harnisch Decl. ¶ 7, ECF No. 72; Harnisch Dep. 63:22-24;

First Gleason Dep. 89:11-18, 104:13-24.) He reported to the Vice President of Sales. (Decl. Joe

Melanson Supp. Defs.' Mot. Summ. J. ("Melanson Decl.") Ex. 4, ECF No. 76-4.)

    Between 2017 and 2018, Filter's business with Nike grew as a result of Dodson's sales.

(*See* Melanson Dep. 62:23-63:5; Harnisch Decl. ¶ 2.) Simultaneously, Nike became dissatisfied

with Filter's work. (*See* Goldstein Decl. Ex. I, Decl. Sarah Parsons ("Parsons Decl.") ¶ 7, ECF

No. 90, explaining that Nike told Filter's Chief Executive Officer that "Nike was looking to

replace Filter for all the business it was doing with Filter"; Goldstein Decl. Ex. J, Decl. Heather

Allerdice-Gerow ("Allerdice-Gerow Decl.") ¶¶ 3-4, ECF No. 90, explaining that "Dodson was

---

[3] Excerpts of Harnisch's deposition transcript are available at Kendall Decl. Ex. 9, ECF
No. 70-9, and Goldstein Decl. Ex. B, ECF No. 90.

not adding much value to the partnership between Filter and Nike, and we did not want to work with Mr. Dodson any longer.")[4]

In response, Filter underwent some organizational restructuring and created a new position titled "Engagement Manager." (*Compare* Melanson Decl. Ex. 4, laying out Filter's 2017 organizational chart, *with* Melanson Decl. Ex. 5, ECF No. 76-5, Filter's organizational chart including the position of Engagement Manager; *see also* Harnisch Decl. ¶ 3; Kendall Decl. Ex. 12 at 3, ECF No. 70-12.) According to Joe Melanson ("Melanson"), Filter's Chief Executive Officer ("CEO") at the time, Filter created the Engagement Manager position because Filter needed day-to-day support and management for the growing number of Filter employees working onsite at Nike. (Melanson Dep. 62:23-63:18; *see also* Olson EEOC Decl. ¶ 3; First Gleason Dep. 119:12-16.) According to the job description, the Engagement Manager would monitor and oversee service delivery and ensure quality control. (Kendall Decl. Ex. 2, ECF No. 70-2.)[5] A 2018 engagement team presentation explained that an Engagement Manager would

---

[4] Defendants argue that the Court may not consider parts of Parsons' and Allerdice-Gerow's declarations because they are not based upon personal knowledge. (Defs.' Reply Pl.'s Resp. ("Defs.' Reply") at 3, ECF No. 94.) The Court disagrees. "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." FED. R. CIV. P. 56(c)(4). Defendants argue that the Nike employees are speculating that Gleason replaced Dodson. (Defs.' Reply at 3.) However, Defendants acknowledge that the employees testified that they personally received information that someone would replace Dodson and that, as part of that hiring process, Filter told them that they had hired Gleason. (*Id.*; *see* Parsons Decl. ¶ 8; Allerdice-Gerow Decl. ¶¶ 5-6.) The Nike employees further explained that they subsequently observed Gleason develop business and sales for Filter. (*See* Parsons Decl. ¶¶ 9-11; Allerdice-Gerow Decl. ¶¶ 7-8.) The Court concludes that the Nike employees have personal knowledge of the facts they assert in their declarations. *See Armstrong v. Hawaiian Airlines, Inc.*, 416 F. Supp. 3d 1030, 1039 (D. Haw. 2019) (concluding that the witness's "positions within Hawaiian Airlines raise an inference that she has personal knowledge about the nature of Defendant's operations at Brisbane International Airport") (citation omitted).

[5] In her response, Gleason argues that the Court should not consider Exhibits 2 and 12 to Kendall's declaration or Exhibit 2 to Harnisch's declaration, arguing that they were unauthenticated. (Pl.'s Opp. Defs.' Mot. Summ. J. ("Pl.'s Resp.") at 18-19, ECF No. 89); *see*

provide "client/employee relations support & reporting" such as one-on-one Filter employee

support, reenforcing Filter policies and benefits, onboarding, orientation, offboarding, and

addressing issues or concerns. (Kendall Decl. Ex. 12 at 3-4; *see also* Melanson Reply Decl. ¶ 2.)

The Engagement Manager would also provide service delivery. (Kendall Decl. Ex. 12 at 4.)

Thus, the Engagement Manager would be housed under the delivery branch of Filter, not its sales

branch. (*See* Melanson Decl. Ex. 5.) The presentation summarized the role as responsible for

"[s]imilar tasks, but this is an entirely NEW function." (Kendall Decl. Ex. 12 at 3.) The

presentation indicated that Filter was hiring "to fill our current need" with a goal of hiring for

Portland by mid-June 2018. (*Id.* at 6.)

## II.    GLEASON'S EMPLOYMENT

Filter hired Gleason for the position of Engagement Manager in late June 2018 with a

start date in July 2018. (*See* Olson EEOC Decl. ¶ 2; Kendall Decl. Ex. 15, ECF No. 70-15.)

During Gleason's first week of employment, Filter fired Dodson for misconduct. (*See* Decl.

Meagan Gleason Supp. Pl.'s Opp. Defs.' Mot. Summ. J. ("Gleason Decl.") ¶ 9;[6] Goldstein Decl.

---

*also* *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("We have repeatedly held that unauthenticated documents cannot be considered in a motion for summary judgment.") (citations omitted). Defendants subsequently filed declarations by Melanson and Harnisch in support of their reply, each swearing that they are over the age of eighteen, could testify if called as a witness, have personal knowledge of the facts in the declarations, and that the exhibits are true and correct copies, and re-attached Kendall's Exhibits 2 and 12. (*See* Decl. Joe Melanson Supp. Defs.' Reply ("Melanson Reply Decl.") Ex. 1, ECF No. 96-1; Decl. Teresa Harnisch Supp. Defs.' Reply Ex. 1, ECF No. 97-1.) Defendants also argue that Harnisch properly authenticated Exhibit 2, appended to her original declaration in which she swore she could testify, had personal knowledge, and that the exhibit was a true and correct copy. (Defs.' Reply at 12.) "In a summary judgment motion, documents authenticated through personal knowledge must be 'attached to an affidavit that meets the requirements of [Federal Rule of Civil Procedure 56(c)(4)] and the affiant must be a person through whom the exhibits could be admitted into evidence.'" *Orr*, 285 F.3d at 773-74 (simplified). The Court concludes that the three exhibits have been properly authenticated.

[6] Gleason's declaration and attached exhibits are available at ECF No. 92 unless otherwise noted.

Ex. H, ECF No. 91.) According to Gleason, the Vice President of Sales told her that she would

"take over" the gaps caused by Dodson's termination.[7] (First Gleason Dep. 92:11-15.)

When Filter hired Gleason, Gleason earned an annual salary of $95,000, was eligible for

a discretionary quarterly bonus of up to 3.75 percent of base pay for meeting performance

objectives,[8] and an annual profit-sharing bonus which varied. (*See* Kendall Decl. Ex. 15;

Harnisch Decl. Ex. 6, ECF No. 72-6.) Gleason reported to the Director of Service Delivery, Don

Olson ("Olson"), and to the Director of Talent Delivery, Michele Kretzer ("Kretzer"). (First

Gleason Dep. 73:25-74:7; Melanson Decl. Ex. 5.) Gleason began managing approximately forty

people, was Filter's first Engagement Manager, and was Filter's only on-site Engagement

Manager. (First Gleason Dep. 73:6-9, 124:14-20, 180:18-21; Melanson Dep. 67:5-12; *see also*

Harnisch Decl. ¶ 4, noting that Filter hired another Engagement Manager in December 2018.)

///

---

[7] Defendants argue that the Court may not consider this statement made by the Vice President of Sales because it is hearsay. (Defs.' Reply at 4.) The Court disagrees. *See JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1110 (9th Cir. 2016) ("[A]t summary judgment a district court may consider hearsay evidence submitted in an inadmissible form, so long as the underlying evidence could be provided in an admissible form at trial, such as by live testimony." (citing *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003))); *see also Conroy v. Hewlett-Packard Co.*, No. 3:14-cv-01580-AC, 2016 WL 1276552, at *3 (D. Or. Mar. 31, 2016) (explaining that statements made by managers or supervisors employed by the defendant within the scope of employment are admissible statements by the defendant's agent offered against the defendant).

[8] Gleason argues and testifies that she never received the quarterly bonus for meeting performance objectives (*see* Pl.'s Resp. at 4; Gleason Decl. ¶ 8), but she has not alleged a related failure to pay wages upon termination claim nor identified evidence in the record suggesting that she satisfied performance objectives for any specific quarter or quarters. (*Cf.* Decl. Negin Karami Supp. Defs.' Mot. Summ. J. ("Karami Decl.") Ex. 2, ECF No. 74-2; Karami Decl. Ex. 5, ECF No. 74-5; Karami Decl. Ex. 7, ECF No. 74-7; Karami Decl. Ex. 8, ECF No. 74-8; Olson EEOC Decl. ¶ 6, suggesting that Gleason was not satisfying performance objectives; *see also* First Gleason Dep. 180:16-181:19, 185:12-186:18, commenting, for example, "I don't understand why that is important to do, or the relevance of it," regarding some of Gleason's supervisor's expectations for her.)

According to Nike employees, Filter informed Nike that they would replace Dodson, the former Client Partner, with someone responsible for both business development and account management. (Parsons Decl. ¶¶ 1, 8; Allerdice-Gerow Decl. ¶ 5.) Upon Gleason's hire, Nike employees observed Gleason performing the same work for which Dodson had previously been responsible. (*See* Parsons Decl. ¶ 2; Allerdice-Gerow Decl. ¶ 2.) According to the Nike employees, Filter held Gleason out as Dodson's replacement. (Parsons Decl. ¶ 8.) For example, in an email, the Vice President of Sales informed a Nike employee that Dodson no longer worked for Filter and that Filter would "be announcing his replacement this week." (Goldstein Decl. Ex. N at 3, ECF No. 91.) Four days later, the Vice President of Sales responded in the same email thread:

> We have recently added an Engagement Manager role to our Nike team, the role has been filled by Meagan Gleason who I have copied on this email. I will let her schedule some time with you to discuss her position in more detail but in the meantime please work with her on any questions you have on the new contract.

(*Id.* at 2.)

Soon after Gleason started working for Filter, confusion arose over Gleason's responsibilities. During her first few weeks on the job, Gleason worked with a new buyer at Nike on a new opportunity. (First Gleason Dep. 89:11-15.) The Vice President of Sales asked Gleason to hand the deal over to an off-site Client Partner. (*Id.* at 89:15-23.) Gleason refused, explaining that it would be disruptive because she had been the main contact negotiating the contract. (*Id.* at 91:8-13.)

On July 31, 2018, Gleason met with Melanson, Filter's CEO. (Melanson Decl. Ex. 1 at 1, ECF No. 76-1.) Gleason expressed that she was told in the interview process that her job description was vague because it was a new role and that Filter was still working through the details, but that the position would blend the Client Partner position with an "Engagement

Partner" position. (*Id.*; *see also* First Gleason Dep. 92:8-15.) After six months, Filter would

decide if it needed to hire an additional Client Partner. (Melanson Decl. Ex. 1 at 1.) Melanson

explained that, regardless of what anyone had said in Gleason's interviews, the Engagement

Manager position was a service delivery role to address the disconnect between the growing

number of Filter employees at Nike and Filter itself. (*Id.*; First Gleason Dep. 93:13-17.)

Melanson proposed that, for the moment, Gleason should spend ninety-five percent of her time

on delivery and only five percent of her time on opportunity spotting. (Melanson Decl. Ex. 1 at

1-2.) Later, Gleason could take on responsibility for changes in the scope of existing contracts

and new business development. (*Id.* at 2.)

Following that conversation, Gleason gave the new account to the off-site male Client

Partner, and Gleason understood her role to be "doing everything but selling," although she

considered her role to include renewing contracts and "any iterative growth within existing"

accounts. (First Gleason Dep. 106:16-107:13; *see also id.* at 108:12-23, explaining that

Gleason's sales work was limited to existing work, not new sales, for the time that the off-site

Client Partner was involved.) At a follow up meeting, Gleason confirmed that she understood her

role and responsibilities. (*See* Melanson Decl. Ex. 2, ECF No. 76-2; Melanson Decl. Ex. 3, ECF

No. 76-3; Melanson Dep. 93:8-17, describing a conversation with Gleason confirming that "her

job was to be focused on the engagement" and she should turn leads over to the off-site Client

Partner.)

Within the first few months of Gleason's employment, the off-site Client Partner left

employment at Filter. (*See* First Gleason Dep. 115:25-116:2; *see also* Melanson Dep. 80:15-23,

noting that the off-site Client Partner was responsible for Nike sales "for a brief period of

time[.]") Filter did not hire another Client Partner or otherwise replace him, and Gleason began

performing both sales and delivery with Nike. (*See* First Gleason Dep. 116:2-10, 117:9-23; Melanson Dep. 82:2-20, confirming that Filter did not subsequently assign a Client Partner to take over Nike, Filter's largest account.) Nobody told Gleason to fill the sales role but, according to Gleason, Filter expected her to "do what it took to turn things around" and was aware of her sales activity because she "discussed every contract with the COO" and with Olson, her supervisor. (First Gleason Dep. 117:9-23, 119:4-25.)

Around August or September 2018, Gleason proposed that she should receive commission for business development because Filter paid Client Partners commission for the same work. (*Id.* at 115:25-116:21; Gleason Decl. ¶¶ 20-21.) At first Filter resisted, but eventually Filter amended Gleason's compensation plan in December 2018, paying her monthly individual gross profit commission of four percent retroactively back to September 2018 on specific eligible Nike orders. (First Gleason Dep. 115:25-116:21; Karami Decl. Ex. 1 at 2, ECF No. 75-1.) Also around September 2018, Gleason began regularly attending sales team meetings led by the Vice President of Sales. (*See* Gleason Decl. ¶ 23; *see also* Dep. Dan Holmes ("Holmes Dep.") 11:24-12:11.)[9] Gleason was the only other attendee who did not have the title of Client Partner. (Gleason Decl. ¶ 23.) Beginning on June 1, 2019, Gleason began receiving 2.5 percent commission on any new or existing Nike contract. (Karami Decl. Ex. 1 at 5.)

As of September 2019, the Nike account had grown and comprised approximately sixty-five percent of Filter's total revenue. (Holmes Dep. 11:16-21, 15:7-11.) There is evidence in the record that suggests Gleason was a driving force of growth. (*See id.* at 13:17-22, 55:3-56:21; Gleason Decl. ¶ 21; Parsons Decl. ¶¶ 9-11; Allerdice-Gerow Decl. ¶¶ 7-8; Harnisch Dep. 70:16-

---

[9] Excerpts of Holmes' deposition transcript are available at Decl. Jose Klein Supp. Pl.'s Mot. Partial Summ. J. ("Klein Decl.") Ex. E, ECF No. 68-5; Goldstein Decl. Ex. P, ECF No. 90; and Third Kendall Decl. Ex. 2, ECF No. 95-2.

22, noting that Gleason generated business on the Nike account in 2018 and 2019; *cf.* Goldstein Decl. Ex. Q, ECF No. 91, acknowledging Gleason's role expanding Filter's business with Nike as of March 2020.)

Gleason had some conflicts with coworkers. In July and August 2018, the Vice President of Sales stated that he felt manipulated and lied to by Gleason because he had asked her to loop in the off-site Client Partner and she had reported that she had completed his request even though she had not worked with the Client Partner, which resulted in a client getting the wrong pricing. (Melanson Decl. Ex. 3 at 2.) In a January 2019 email chain, Olson, one of Gleason's supervisors, expressed his frustration that Gleason continued to miss "expectations around process for her role[.]" (Karami Decl. Ex. 2 at 1; *see also* Karami Decl. Ex. 4, ECF No. 74-4, October 2018 email requesting a response from Gleason by a deadline without a response; Karami Decl. Ex. 3, ECF No. 74-3, January 2019 email requesting a response from Gleason by a deadline without a response; Karami Decl. Exs. 7-8, June 2019 documentation of Gleason's missing tasks; EEOC Decl. Negin Karami ("Karami EEOC Decl.") ¶ 5, ECF No. 85, describing conflicts in November 2019; EEOC Decl. Eric Adams ("Adams EEOC Decl.") ¶¶ 3-4, ECF No. 83, describing conflicts in February and March 2020; EEOC Decl. Joe Melanson ¶ 4, ECF No. 84, describing conflicts in March 2020; Olson EEOC Decl. ¶ 7, recounting that Gleason would go on international vacations without notifying her supervisors.)[10] Around January 2019, a Filter human resources manager began engaging in conflict resolution mediation with Gleason and her two supervisors, Olson and Kretzer (who also had an interpersonal conflict between the two of them), over issues around communication, respect, and reporting. (*See* Karami Decl. Ex. 6, ECF No. 74-6; *see also*

---

[10] However, a dispute of fact remains. (*See* Gleason Decl. Ex. H at 4, explaining that the allegation that Gleason went on vacation without permission was false given email and calendar notifications revealing that Gleason notified her boss and team before being out of office.)

Karami Decl. Ex. 5.) Kretzer and Gleason continued to have conflicts and again engaged with human resources dispute resolution in December 2019. (Karami Decl. Exs. 9-10, ECF Nos. 74-9 and 74-10.)

There is no evidence in the record that Gleason ever received any discipline, a performance plan, or negative performance evaluations for her job execution. (*See* Goldstein Decl. Ex. Q at 2, noting that Gleason had not received any formal performance feedback.)

## III.    DENTSU'S ACQUISITION OF FILTER

Dentsu is a global company, headquartered in Japan, which provides marketing and agency services. (Decl. Philip Filippopoulos Supp. Defs.' Mot. Summ. J. ("Filippopoulos Decl.") ¶ 2, ECF No. 80.) Dentsu UK is a subsidiary of Dentsu. (*Id.*) In 2019, Dentsu purchased Filter. (Goldstein Decl. Ex. A, Dep. Negin Karami 75:7-13, ECF No. 90; *see also* Gleason Decl. ¶ 3; Goldstein Decl. Ex. T at 1, ECF No. 91.)

In late 2019 or early 2020, following restructuring, Filter moved Gleason to a "Senior Account Director" position. (Olson EEOC Decl. ¶ 10.) There is evidence in the record that, as a Senior Account Director, Gleason was tasked with sales and service delivery and received a base salary of $150,000 annually with a monthly gross profit incentive of up to 1.75 percent of the gross profit recognized in the month for the Nike account. (*See* Harnisch Decl. Ex. 1 at 1, ECF No. 73-1; Harnisch Decl. Ex. 3, ECF No. 72-3; Karami EEOC Decl. ¶ 6.) Gleason continued to report to Olson, the Director of Service Delivery. (Olson EEOC Decl. ¶ 10.) Gleason also worked more closely with Eric Adams ("Adams"), the General Manager of Client Solutions and Delivery at the time. (*See* Adams EEOC Decl. ¶ 2.) In February 2020, Gleason reported to human resources that she felt like Adams treated her differently because she was a woman. (*See* Gleason Decl. Ex. H at 4; Goldstein Decl. Ex. Q.)

///

PAGE 11 – OPINION AND ORDER

In March 2020, Filter moved Gleason to the Client Partner role. (Olson EEOC Decl. ¶ 11; Harnisch Decl. ¶ 6.) Gleason continued to receive a base salary of $150,000 annually, with one percent commission of gross profit recognized in the month and six percent of gross profit from new business units. (Harnisch Decl. ¶ 7; Harnisch Decl. Ex. 2, ECF No. 73-2.) Gleason viewed the change in roles as a demotion. She messaged a friend, "[Filter] just took the account from me," they "[m]ade me Jim [Dodson]," and "[t]hey've moved me to what Jim was doing . . . [s]ales only[.]" (Kendall Decl. Ex. 10, ECF No. 71-5.)

In July 2020, Gleason filed a charge of discrimination with the EEOC. (Gleason Decl. Ex. H at 1.) In December 2021, Gleason filed the instant lawsuit. (*See* Compl., ECF No. 1.)

In 2022, as part of Dentsu's acquisition of Filter, Dentsu worked to map Filter employees onto Dentsu's career framework—a list of Dentsu's standardized roles. (Dep. Nick Scott ("Scott Dep.") 14:17-24;[11] Decl. Nick Scott Supp. Defs.' Mot. Summ. J. ("Scott Decl.") Ex. 1 at 1-2, ECF No. 78-1.) Gleason's Client Partner job corresponded with Dentsu's internal title of "Enterprise Business Development Manager." (Scott Dep. 18:5-9; Dep. Philip Gaughran ("Gaughran Dep.") 21:22-22:4;[12] *see also* Kendall Decl. Ex. 13 at 7, ECF No. 70-13.) As part of the integration, Gleason's compensation structure changed. (Scott Decl. ¶ 2, ECF No. 77.) Employees did not receive commissions but instead received bonuses under Dentsu's bonus structure. (*Id.*) Gleason's salary with Dentsu as of January 2023 was $225,000 and she was

---

[11] Excerpts of Scott's deposition transcript are available at Kendall Decl. Ex. 8, ECF No. 70-8, Goldstein Decl. Ex. M, ECF No. 90, and Decl. Jose Klein Supp. Pl.'s Reply Defs.' Resp. ("Second Klein Decl.") Ex. C, ECF No. 100-3.

[12] Excerpts of Gaughran's deposition transcript are available at Kendall Decl. Ex. 14, ECF No. 70-14; Decl. Stephan Kendall Supp. Defs.' Resp. Pl.'s Mot. Partial Summ. J. ("Second Kendall Decl.") Ex. 1, ECF No. 87-1; Goldstein Decl. Ex. X, ECF No. 90; Third Kendall Decl. Ex. 3, ECF No. 95-3; and Second Klein Decl. Ex. B, ECF No. 100-2.

eligible for a bonus of up to ten percent.[13] (Scott Decl. Ex. 1 at 1-2.) With the change, Gleason

became the highest paid Filter employee. (*See* Harnisch Decl. ¶ 8; Decl. Philip Gaughran Supp.

Defs.' Mot. Summ. J. ("Gaughran Decl.") ¶ 4, ECF No. 81.) Gleason's new supervisor was

Phillip Gaughran ("Gaughran"). (Gaughran Dep. 8:18-25.)

After Gaughran began supervising Gleason, two other employees raised complaints about

Gleason to Gaughran. (*Id.* at 38:11-40:5; Gaughran Decl. ¶ 2.) For example, they reported that

between December 2022 and January 2023, Gleason was using her Nike email address to

communicate with Nike employees even though Nike had asked Filter employees to use their

Filter email accounts. (*See* Kendall Decl. Ex. 4, ECF No. 71-1; Kendall Decl. Ex. 6, ECF No. 71-

3; Gaughran Decl. ¶ 3; *see also* Kendall Decl. Ex. 7, ECF No. 71-4, reporting a disagreement in

February 2023 about how to communicate with a client; *cf.* Holmes Dep. 50:24-51:19,

characterizing the complaints by Gleason's teammates as "kind of immature and distracting.")

## IV.    GLEASON'S TERMINATION

On March 14, 2023, Gleason met with her supervisors including Gaughran. (Goldstein

Decl. Ex. Z, ECF No. 91; Gaughran Dep. 60:15-62:4.) The meeting agenda indicated that a

different employee, who had not previously worked on the Nike account, would take over

drafting statements of work on new Nike contracts, and Gleason was told as much at the

meeting. (Goldstein Decl. Ex. Z; Gleason Decl. ¶ 33.) According to Gaughran, Defendants were

working to improve the contract renewal process because in the past it had been "quite messy,"

and Defendants were taking an "all-hands-on-deck approach." (Gaughran Dep. 59:5-60:20.)

Additionally, Gaughran instructed Gleason that, at the client's request, one of her coworkers, not

---

[13] Gleason also remained eligible for Dentsu's Flexible Time Off plan, which provided eighty hours of "sick and safe time" in addition to paid time off, and Gleason was an "at-will" employee. (*See* Scott Decl. Ex. 1 at 2; Klein Decl. Ex. D, Dep. Meg Ryan 36:5-37:3, ECF No. 68-4; Gleason Decl. ¶ 35.)

Gleason, should be the only point of contact on a specific Nike contract moving forward.

(Kendall Decl. Ex. 5, ECF No. 71-2; Gaughran Decl. ¶ 3.)

The following day, March 15, 2023, Gleason wrote to Dentsu's Global Chief People

Officer, Iván Cswan Altobelli ("Altobelli"), in an email with the subject "Retaliation and Sick

Leave." (Gleason Decl. Ex. J at 16-17.) Gleason alleged retaliation:

> Yesterday I was removed from a significant part of my role
> on our Nike account without any notice aside from being included
> in a meeting where a workback schedule was walked through and a
> male co-worker who does not work on the Nike account was
> supplanted into my role. Everyone on the call pretended this was
> normal operating procedure. No conversation was had with me
> prior nor has been since the meeting to provide me with any
> information about this significant change in my role. This is yet
> another instance of retaliation.
>
> Three years ago, almost to the day, I was removed from
> overseeing the entirety of the Nike account and a line was drawn
> between growth and delivery. Since then, the delivery team has
> lost between $15-20M worth of our business each year. The
> delivery team continues (yesterday's reveal included) to be handed
> more and more of my responsibility despite their performance.
> Coupled with this, the delivery and talent team engage in abusive
> behavior toward me, this behavior often supported and instigated
> by their leadership. I've been begging HR to stop this and it rarely
> receives a response.

(*Id.* at 17.) Altobelli responded that the company would "need time to investigate internally." (*Id.*

at 15.)

Gleason also advised that the work environment had "contributed to an incredible amount

of stress and as a result, my health [is] plummeting." (*Id.* at 17.) Relatedly, she would be

undergoing invasive medical procedures over the next few weeks and would be taking four

weeks of sick leave starting the following day. (*Id.*) Altobelli responded at around 5:30 p.m. that

evening that Dentsu's policy only permitted use of eighty hours of "sick & safe time" in a year

and that Gleason's medical absence would likely fall under a medical leave policy. (*Id.* at 15.)

PAGE 14 – OPINION AND ORDER

Altobelli advised that Gleason would have to request medical leave through the Lincoln Financial group, a third-party leave administrator. (*Id.*)

On March 22, 2023, and March 28, 2023, Meg Ryan ("Ryan"), a human resource lead with Dentsu and copied on Altobelli's response, emailed Gleason inquiring about the status of her leave because Gleason had not initiated a leave claim with Lincoln Financial and Gleason had already used thirty-two of her allotted eighty hours of "sick & safe" leave for the year. (*Id.* at 11-13.) Ryan advised that Gleason was currently absent from work "without a valid leave in place" and that Gleason must contact Lincoln Financial by the close of business on March 31, 2023. (*Id.* at 12.) Defendants' written policy required employees to contact Lincoln Financial within thirty days of the start date of their leave. (Klein Decl. Ex. H at 2; *see also* Dep. Meg Ryan ("Ryan Dep.") 130:2-7.)[14]

On March 29, 2023, Gleason replied that she had been at the hospital and that she had entered her paid time off in the company's online time management program, Workday. (Gleason Decl. Ex. J at 11.) Ryan responded the same day that Gleason nonetheless had to follow the medical leave of absence policy, requesting that Gleason update her out-of-office message with who to contact, and advising "[*y*]*ou should not work while on a leave of absence*." (*Id.* at 9.) On March 30, 2023, Gleason responded that she was planning on spending spring break with her family, that she had a medical emergency arise, but that she did not qualify for medical leave. (*Id.* at 8-9.) Ryan responded again directing Gleason to Lincoln Financial based on her characterizations of her leave as for invasive medical procedures and in response to a medical emergency. (*Id.* at 7.) Gleason again rejected Ryan's directive. (*Id.* at 6-7.)

---

[14] Excerpts of Ryan's deposition transcript are available at Klein Decl. Ex. D, ECF No. 68-4, Second Kendall Decl. Ex. 2, ECF No. 87-2, Goldstein Decl. Ex. K, ECF No. 90, and Second Klein Decl. Ex. A, ECF No. 100-1.

On April 3, 2023, Ryan emailed Gleason that Gleason's March 15, 2023, request for flexible time off starting March 16, 2023, was pending and that Gleason's manager had not otherwise approved time off. (*Id.* at 5.) Ryan advised that the company's policy generally required at least one month's notice of a request for leave of one week or more and that, "[w]ithout approved time off or an approved leave of absence, you are not authorized to be out of work." (*Id.*)

On April 18, 2023, Ryan emailed Gleason inquiring whether she had returned to work and again indicating that Gleason did not have approval for leave or time off. (*Id.* at 3-4.) Gleason responded with a screenshot from Workday indicating approval of thirty-two days of leave through April 28, 2023, but noting that Gleason had some client emails that she had started working on that needed responses or action. (*Id.*) That day, Gleason began responding to client emails. (*See, e.g.*, Klein Decl. Ex. G at 2-3, ECF No. 68-7, "Apologies, I've been [out of office] on [paid time off]. I'll send you a draft [statement of work] and estimated cost included therein.")

Later that day, Ryan responded to Gleason's screenshot:

> What you've attached below looks to be the email that is automatically generated when the Benefits team put you on unpaid leave so that we could refer you to Lincoln. You did not request time off through 4/28 and you do not have approved leave through 4/28.

> Your unapproved FTO request and email to Ivan specified that you'd be out for 4 weeks—the unapproved Workday request you submitted the day before your absence runs through 4/14. A return date of 4/28 is a 6 week vacation, which again is not approved.

> If you need leave for the next two weeks, you need to reach out to Lincoln to reopen your leave claim.

> If you are not back to work you should not be handling work matters or responding to clients. Additionally, it appears as though you have been responding from your Nike email, which as

> I understand it, you have already been made aware you are not
> authorized to use.
>
> Please confirm your work status and stop all client
> communication immediately.

(Gleason Decl. Ex. J at 1-2.) There is no evidence in the record that Gleason sent any more client emails following Ryan's April 18 email.

On April 20, 2023, Ryan again emailed Gleason that human resources had become aware that Gleason was communicating with clients even though she had indicated that she would remain on leave through April 28, 2023, that Gleason had not turned on an out-of-office message, and that Gleason's manager had instructed her "not to engage in any work unless and until you notified HR that you are returning to work[.]" (Decl. Meg Ryan Supp. Defs.' Mot. Summ. J. ("Ryan Decl.") Ex. 2 at 3, ECF No. 79-2.) Ryan directed Gleason not to perform any work and to clarify her work status. (*Id.*) On April 21, 2023, Gleason responded that her April 18, 2023, email had indicated she had started working on April 17, 2023, and that she had also notified Gaughran that she was back at work. (*Id.* at 2.)

In a letter from Ryan, Defendants terminated Gleason's employment on April 24, 2023, citing Gleason's "unapproved extended absence" from work. (Kendall Decl. Ex. 16 at 1, ECF No. 70-16.) Gleason's termination letter explained, in part:

> You did not inform your manager or team that you were
> communicating with the client . . . . As a result, the team was
> blindsided by this client contact when the client complained about
> receiving contradictory messages from different employees at
> Filter. . . . In this case, your actions resulted in the wrong
> information being given to the client. This created significant
> confusion and further compromised client trust[.]

(*Id.*) Ryan testified that Defendants terminated Gleason's employment because of internal relationship issues with two coworkers, her failure to follow Ryan's instruction not to communicate with clients while on leave, and her failure to follow Defendants' leave protocol.

PAGE 17 – OPINION AND ORDER

(*See* Ryan Dep. 51:1-16, 59:23-61:3.) Beyond Ryan's testimony that she referred the report of retaliation to employee relations, there is no evidence of any investigation into Gleason's report before her termination. (*See id.* at 79:3-9, 124:25-125:3; Gaughran Dep. 71:19-72:11.)

## LEGAL STANDARDS

Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). At the summary judgment stage, the court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in favor of that party. *See Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 891 (9th Cir. 2005). "[W]hen simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them." *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001). The court does not assess the credibility of witnesses, weigh evidence, or determine the truth of matters in dispute. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

## DISCUSSION

Gleason alleges that (1) Defendants paid her discriminatory wages in violation of the EPA, (2) Defendants retaliated against her in violation of the EPA, (3) she received disparate treatment in violation of Title VII, (4) Defendants retaliated against her in violation of Title VII, (5) Defendants paid her discriminatory wage rates in violation of Oregon Revised Statutes § 652.220, (6) Defendants retaliated against her in violation of Oregon Revised Statutes

§ 659A.030, and (7) Defendants failed to pay wages upon termination in violation of Oregon Revised Statutes §§ 652.140 to 652.150. (SAC at 1, 13-22.) Before the Court are Defendants' motion for summary judgment (Defs.' Mot. Summ. J. ("Defs.' Mot."), ECF No. 69) and Gleason's motion for partial summary judgment (Pl.'s Mot. Partial Summ. J. ("Pl.'s Mot."), ECF No. 66).

## I.      PERSONAL JURISDICTION

Defendants argue that the Court lacks personal jurisdiction over Dentsu UK. (Defs.' Mot. at 15-17.) The Court agrees.

### A.      Applicable Law

"Where a defendant moves to dismiss a complaint for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that jurisdiction is appropriate." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004) (citing *Sher v. Johnson*, 911 F.2d 1357, 1361 (9th Cir. 1990)). Unless there has been an evidentiary hearing, "the plaintiff need only make a prima facie showing of jurisdictional facts." *Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101, 1106 (9th Cir. 2020) (quoting *Schwarzenegger*, 374 F.3d at 800).

"An exercise of personal jurisdiction in federal court must comport with both the applicable state's long-arm statute and the federal Due Process Clause." *Burri Law PA v. Skurla*, 35 F.4th 1207, 1212 (9th Cir. 2022) (citing *Chan v. Soc'y Expeditions, Inc.*, 39 F.3d 1398, 1404-05 (9th Cir. 1994)). Oregon's long-arm statute "authorizes personal jurisdiction over defendants to the full extent permitted by the United States Constitution." *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1068 (9th Cir. 2015) (citing OR. R. CIV. P. 4(L)). Accordingly, the Court must inquire whether its exercise of jurisdiction over Dentsu UK would comport with the limits imposed by federal due process. *See id.* ("We therefore inquire whether the District of Oregon's exercise of

jurisdiction over [the defendant] comports with the limits imposed by federal due process.")
(simplified).

"Federal due process permits a court to exercise personal jurisdiction over a nonresident
defendant if that defendant has at least minimum contacts with the relevant forum such that the
exercise of jurisdiction does not offend traditional notions of fair play and substantial justice."[15]
*Glob. Commodities*, 972 F.3d at 1106 (simplified). The Ninth Circuit uses a "three-part test to
analyze whether a party's minimum contacts meet the due process standard for the exercise of
specific personal jurisdiction[.]" *LNS Enters. LLC v. Cont'l Motors, Inc.*, 22 F.4th 852, 859 (9th
Cir. 2022) (simplified); *Briskin v. Shopify, Inc.*, 87 F.4th 404, 411 (9th Cir. 2023) ("For specific
jurisdiction to exist over a non-resident defendant, three conditions must be met."); *see also*
*Freestream Aircraft (Berm.) Ltd. v. Aero Law Grp.*, 905 F.3d 597, 603 (9th Cir. 2018)
(explaining that the three-prong inquiry is "commonly referred to as the minimum contacts
test").

"First, '[t]he non-resident defendant must purposefully direct [its] activities or
consummate some transaction with the forum or resident thereof; or perform some act by which
[it] purposefully avails [it]self of the privilege of conducting activities in the forum, thereby
invoking the benefits and protections of its laws.'" *Glob. Commodities*, 972 F.3d at 1107
(quoting *Schwarzenegger*, 374 F.3d at 802). Second, the plaintiff's "claim must arise out of or
relate to the defendant's forum-related activities." *Id.* (citing *Schwarzenegger*, 374 F.3d at 802).

---

[15] Although there are two bases for personal jurisdiction (i.e., specific and general
jurisdiction), the Court need engage only in a specific jurisdiction analysis here because Gleason
does not assert that Dentsu UK is subject to general jurisdiction in Oregon. *Cf. Burri*, 35 F.4th at
1213 n.4 ("Personal jurisdiction may be specific or general. [The plaintiff] does not contend that
the [d]efendants are subject to general personal jurisdiction in [the forum state], so we do not
address the analytical framework applicable to general personal jurisdiction cases.") (citation
omitted).

Third, the district court's exercise of personal jurisdiction over the defendant must be reasonable.
*Id.*

"All three prongs must be satisfied [for a court] to assert personal jurisdiction[.]" *LNS Enters.*, 22 F.4th at 859. "If the plaintiff succeeds in satisfying both of the first two prongs, the burden then shifts to the defendant to present a compelling case that the exercise of jurisdiction would not be reasonable." *Glob. Commodities*, 972 F.3d at 1107 (simplified).

### B.    Analysis

Dentsu UK is incorporated in and has its principal place of business in the United Kingdom, is not a parent corporation of Filter, and does not conduct business within the United States. (Filippopoulos Decl. ¶¶ 3-5.) It took no actions regarding or affecting Gleason's employment and does not influence or control Filter's actions. (*Id.* ¶ 5.) In her response, Gleason does not address Defendants' personal jurisdiction argument (*see generally* Pl.'s Resp.), and at oral argument Gleason conceded that the Court lacks personal jurisdiction over Dentsu UK.

The Court concludes that Gleason has not satisfied her burden of making a prima facie showing of jurisdictional facts. Gleason has not identified any evidence in the record suggesting that Dentsu UK purposefully availed itself of the privilege of conducting activities in Oregon or purposefully directed its activities toward Oregon. Because Gleason has not met her burden of establishing the first prong of the specific jurisdiction test, the Court does not address the other two prongs. *See Boschetto v. Hansing*, 539 F.3d 1011, 1016 (9th Cir. 2008) ("[I]f the plaintiff fails at the first step, the jurisdictional inquiry ends and the case must be dismissed." (citing *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1155 (9th Cir. 2006))); *CSX Transp., Inc. v. Apex Directional Drilling, LLC*, No. 3:14-cv-00470-HA, 2014 WL 6473554, at *4 (D. Or. Nov. 18, 2014) ("Given that [the defendant] cannot establish that [a third-party defendant] purposefully

availed itself of the Oregon forum, this court need not proceed to the remaining inquiries under the Ninth Circuit's specific jurisdiction test." (citing *Boschetto*, 539 F.3d at 1016)).

Accordingly, the Court dismisses Gleason's claims against Dentsu UK for lack of personal jurisdiction. *See X Corp. v. Ctr. for Countering Digital Hate Ltd.*, No. 23-cv-03836-CRB, 2024 WL 1245993, at *17 (N.D. Cal. Mar. 25, 2024) (dismissing for lack of personal jurisdiction where the United Kingdom defendant, an affiliated corporate entity, had received login credentials to a server based in the United States); *E*Healthline.com, Inc. v. Pharmaniaga Berhad*, No. 2:18-cv-1069-MCE-EFB, 2020 WL 5495284, at *5 (E.D. Cal. Sept. 11, 2020) (concluding that the Court did not have specific jurisdiction over a Saudi Arabian company that exchanged phone calls, emails, and teleconferences with a California company), *findings and recommendation adopted*, 2020 WL 5891581 (E.D. Cal. Oct. 5, 2020), *aff'd in relevant part*, No. 20-17182, 2022 WL 1744060 (9th Cir. May 31, 2022).

## II.    PAY EQUITY CLAIMS

Gleason alleges that Defendants paid her less than Dodson, the man who held the position of Client Partner immediately before she began working for Filter and who she asserts performed substantially similar work, in violation of the EPA (29 U.S.C. § 206(d)), the Oregon Equal Pay Act ("OEPA") (Oregon Revised Statutes § 652.220), and Title VII (42 U.S.C. § 2000e-2(a)). (*See* SAC at 13-14, 16-20, claims one, three, and five.) The Court considers those three claims together because the EPA, the OEPA, and Title VII all prohibit wage discrimination. *See Freyd v. Univ. of Or.*, 990 F.3d 1211, 1223 (9th Cir. 2021) (concluding that because the plaintiff raised a genuine issue of material fact under the EPA for wage discrimination, the plaintiff's OEPA claim also survived summary judgment); *Maxwell v. City of Tucson*, 803 F.2d 444, 446 (9th Cir. 1986) ("Title VII and the Equal Pay Act overlap because both make unlawful differentials in wages on the basis of a person's sex."). Gleason also asserts

that Defendants failed to pay her wages upon termination as a result of their discriminatory wage practices in violation of Oregon Revised Statutes §§ 652.140 to 652.150. (SAC at 21-22, claim seven.)

### A.    EPA

The EPA provides:

> No employer . . . shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex[.]

29 U.S.C. § 206(d)(1).

"An employee bears the burden of establishing a prima facie case of wage discrimination by showing that 'the employer pays different wages to employees of the opposite sex for substantially equal work.'" *Rizo v. Yovino*, 950 F.3d 1217, 1222 (9th Cir. 2020) (en banc) (quoting *Maxwell*, 803 F.2d at 446). "If the plaintiff puts forth a prima facie case of an EPA violation, 'the burden shifts to the employer to show that the differential is justified under one of the Act's four exceptions.'" *Id.* (quoting *Corning Glass Works v. Brennan*, 417 U.S. 188, 196 (1974)).

Defendants argue that any difference in compensation was not tied to gender, Gleason did not perform equal work compared to Dodson, Dodson should not be the only comparator if Gleason did perform equal work, and if Gleason has established a prima facie case, then Defendants have satisfied their burden of establishing an affirmative defense. (Defs.' Mot. at 18-27.)

### 1.    Discriminatory Intent

Defendants first argue that Gleason's deposition testimony suggests that any difference in compensation was based on the needs of the business, not on gender. (*Id.* at 18-19.) Gleason responds that the EPA does not require a showing of intent to discriminate. (Pl.'s Resp. at 13.)

"Unlike Title VII, the EPA does not require proof of discriminatory intent." *Rizo*, 950 F.3d at 1223 (citations omitted). Instead, "the EPA 'creates a type of strict liability[.]'" *Id.* (quoting *Maxwell*, 803 F.2d at 446). Accordingly, the Court agrees with Gleason that she need not demonstrate discriminatory intent to establish a prima facie case under the EPA. *See McMinimee v. Yakima Sch. Dist. No. 7*, No. 1:18-cv-3073-TOR, 2019 WL 11680199, at *13 (E.D. Wash. Aug. 7, 2019) ("Plaintiff need not prove the pay differential was on the basis of sex to present a prima facie case—whether the disparate pay was based on a factor other than sex is an affirmative defense for which [the defendant] must prove." (citing 29 U.S.C. § 206(d)(1))).

### 2.    Equal Work

#### a.    Applicable Law

"Generally, the [EPA] requires that women receive 'equal pay for equal work.'" *Gunther v. Wash. Cnty.*, 623 F.2d 1303, 1309 (9th Cir. 1979) (citation omitted). The plaintiff bears the burden of proving that she did not receive equal pay for equal work but is not required to show that the jobs performed were identical. *See id.* "Instead, the plaintiffs may prove a violation of the [EPA] by showing that the skill, efforts, and responsibility required in the performance of the jobs is 'substantially equal.'" *Id.* (citations omitted). "To make this showing, actual job performance and content[,] not job titles, classifications[,] or descriptions is determinative." *Id.* (citations omitted). "[T]he crucial finding on the equal work issue is whether the jobs to be compared have a 'common core' of tasks." *Freyd*, 990 F.3d at 1220 (quoting *Stanley v. Univ. of S. Cal.*, 178 F.3d 1069, 1074 (9th Cir. 1999)). "It is the overall job, not its individual segments,

that must form the basis of comparison, and, because job duties vary so widely, each suit must be determined on a case-by-case basis." *Gunther*, 623 F.2d at 1309 (citation omitted).

In *Freyd*, the Ninth Circuit reversed a grant of summary judgment, holding that a reasonable jury could conclude that a female psychology professor shared a common core of tasks with male professors despite their work in separate laboratories, supervision of different projects, teaching of different courses, supervision of different doctoral students, and management of different centers. 990 F.3d at 1220-23. In *Hein*, the Ninth Circuit concluded that a male basketball coach who "spent three-quarters of his time teaching and one-quarter of his time coaching" was an improper comparator for a female teacher who "spent 100% of her time teaching lecture classes" because "[a] coaching job plainly requires skills that a noncoaching job does not." *Hein v. Or. Coll. of Educ.*, 718 F.2d 910, 914 (9th Cir. 1983).

### b.    Analysis

Defendants argue that Dodson, a Client Partner, is not an appropriate comparator for Gleason in her first position of Engagement Manager. (Defs.' Mot. at 20-22.) Defendants argue that a Client Partner's core responsibilities were sales and revenue growth, while the Engagement Manager's core responsibilities included employee relations and did not include sales. (*Id.* at 21.) Gleason responds that Defendants rely heavily on job titles and job descriptions but that a genuine issue of material fact remains as to whether Defendants hired Gleason to replace Dodson and that she has presented evidence that her core responsibilities included sales and revenue growth. (Pl.'s Resp. at 14-15.)

It is undisputed that at least part of Gleason's role as an Engagement Manager was employee relations. (*See* Melanson Decl. Ex. 1; Karami Decl. Ex. 2; Karami Decl. Ex. 4; First Gleason Dep. 73:6-9.) The record also reveals that Filter's CEO directed Gleason to spend ninety-five percent of her time on delivery when she first started the position. (*See* Melanson

PAGE 25 – OPINION AND ORDER

Decl. Ex. 1 at 1-2; First Gleason Dep. 106:21-107:5, conceding that following the meeting with Melanson, Gleason was supposed to do "everything but selling" new business; *see also id.* at 108:7-23, noting that Dodson handled new sales at Nike and admitting that Gleason was told not to do sales except on existing work "for the brief time that [the off-site Client Partner] stepped in.")

However, Filter's CEO had noted that Gleason could eventually take on more responsibility for sales.[16] (Melanson Decl. Ex. 1 at 1-2.) Shortly thereafter, the off-site Client Partner left Filter's employment, Gleason began attending sales meetings, and she began discussing her sales with her supervisor. (*See* First Gleason Dep. 115:25-116:10, 117:9-23; Melanson Dep. 80:15-23, 82:2-20; Gleason Decl. ¶ 23.) As of September 2018, Gleason began earning commission on the expansion of eleven existing "statements of work" with Nike. (Karami Decl. Ex. 1 at 1-4.) Beginning approximately eleven months after Gleason joined Filter, Filter again changed her compensation scheme and paid Gleason commission on all existing and new Nike contracts without any restrictions. (*Id.* at 5-6.) Those around Gleason also observed her performing sales and revenue growth. (*See* Holmes Dep. 13:17-22, 55:3-56:21, suggesting that Gleason was responsible for much of Filter's expanding business with Nike; Harnisch Dep. 70:16-22, acknowledging that Gleason generated business on the Nike account in 2018 and

---

[16] Gleason argues that Defendants' business records state that she was hired for a Client Partner job opening. (Pl.'s Resp. at 4, citing Goldstein Decl. Ex. L, ECF No. 90.) At oral argument, Gleason argued that a reasonable fact finder could conclude that the exhibit suggests that Defendants hired her into the position of Client Partner in 2018 because the document lists "Client Partner" in the column titled "Job Requisition" immediately before the date of June 28, 2018, in the column titled "Hire Effective Date." Viewing the evidence in the light most favorable to Gleason, a question of fact remains. (*See* Decl. Meg Ryan Supp. Defs.' Reply ¶ 2, ECF No. 98, explaining that the Workday entry reflects information as of Gleason's termination, when Gleason held the title of Client Partner.)

2019; Parsons Decl. ¶ 9; Allerdice-Gerow Decl. ¶ 7; *cf.* Goldstein Decl. Ex. Q, Filter's director

of human resources noting in March 2020, "[y]ou have been able to expand the Nike business.")

Defendants suggest that all of Gleason's sales activity was unsanctioned or was merely

incidental to her core job functions. (*See* Defs.' Mot. at 21-22.) However, the evidence that

Filter's CEO stated that in time Gleason could engage in sales, Defendants did not assign another

Client Partner to its largest account, Nike, Gleason received a revised compensation package,

and her supervisor reviewed contracts with her suggest that, after the first few months of her

employment, Filter endorsed Gleason's participation in sales. Accordingly, genuine issues of

material fact remain as to whether, at least several months into her employment with Filter,

Gleason's core job responsibilities were substantially equal to those of a Client Partner. (*See*

Gleason Decl. Ex. F, ECF No. 93, Gleason's supervisor explaining in October 2018 that

Gleason's role involved business development and that "[i]n any other account, the TSP would

work with the [Client Partner] to achieve these same goals");[17] *see Freyd*, 990 F.3d at 1221 ("In

this respect, they are not identical. But we are unable *as a matter of law* to pronounce their

_____

[17] Defendants object to Gleason's testimony in her declaration that she "believed at the time and still believe" that this email "correctly described [her] responsibility for business development in 2018 and after." (Defs.' Reply at 5-6, citing Gleason Decl. ¶ 25.) Defendants argue that "conclusory or speculative testimony" is insufficient to raise a genuine issue of fact to defeat summary judgment, and Defendants argue that Gleason's testimony about the email contradicts her deposition testimony that she understood her job would not include sales when the off-site Client Partner became involved. (*Id.*, quoting *Anheuser-Busch, Inc. v. Nat. Beverage Distributors*, 69 F.3d 337, 345 (9th Cir. 1995).) Viewing the evidence in the light most favorable to Gleason, the Court concludes that Gleason has identified a genuine issue of fact based on more than "conclusory or speculative testimony" and that, because the off-site Client Partner left Filter's employment shortly after Gleason's conversation with the CEO, Gleason's testimony in her declaration is not necessarily inconsistent with her deposition testimony. *See Delima v. Home Depot U.S.A., Inc.*, 616 F. Supp. 2d 1055, 1079 (D. Or. 2008) ("Because plaintiff's declaration is not necessarily inconsistent with the cited deposition testimony, the motion to strike this portion of the declaration is denied.").

responsibilities so unique that they cannot be compared for purposes of the Equal Pay Act."
(citing *Hein*, 718 F.2d at 914-17)).

Defendants also argue that Gleason's statement that Defendants "[m]ade me Jim
[Dodson]" when they moved her into a Client Partner position in 2020 indicates that Gleason
knew that the positions were different. (Defs.' Mot. at 21, citing Kendall Decl. Ex. 10.)
Construing the evidence in the light most favorable to Gleason, the Court concludes that
Gleason's statement is not dispositive because a reasonable fact finder could understand
Gleason's statement to convey that she had been demoted from a role that involved greater skill
in sales, employee relations, *and* delivery to a role that involved only sales. (*See* First Gleason
Dep. 107:21-22, explaining her role as Engagement Manager as "[Dodson's] job description plus
the delivery side of the business."); *see also* 29 C.F.R. § 1620.14(a) ("[D]ifferences in skill,
effort or responsibility which might be sufficient to justify a finding that two jobs are not equal
. . . if the greater skill, effort, or responsibility has been required of the higher paid sex, do not
justify such a finding where the greater skill, effort, or responsibility is required of the lower paid
sex."); *Wachter-Young v. Ohio Cas. Grp.*, 236 F. Supp. 2d 1157, 1162 (D. Or. 2002) ("[I]t is
axiomatic that the fact that males performing jobs with less responsibility receive higher pay is
sufficient to establish plaintiff's prima facie case." (citing 29 C.F.R. § 1620.14(a))).

Defendants assert that the fact that Gleason reported to the Directors of Talent Delivery
and Service Delivery instead of the Vice President of Sales and that her position was couched
under the delivery branch of the organization also indicate that Gleason's responsibilities were
different, and the work was not substantially equal. (Defs.' Mot. at 21.) However, the record
reflects that when Gleason changed roles to become a Senior Account Director, which

Defendants concede involved sales, she continued reporting to the Director of Service Delivery. (*See* Olson EEOC Decl. ¶ 10.) Thus, questions of fact remain.

Gleason also alleges that she received unequal compensation after she moved to the role of Client Partner.[18] (*See* Pl.'s Resp. at 19.) Defendants concede that her new role involved sales, and Defendants do not meaningfully argue that Gleason did not perform substantially equal work to Dodson and other Client Partners when Gleason became a Client Partner. (*See* Defs.' Mot. at 3, 9.)

Accordingly, the Court concludes that a genuine dispute of material fact remains as to when, if ever, Gleason performed substantially equal work as compared to a Client Partner.

### 3.    Within Any Establishment

If Gleason performed substantially equal work compared to a Client Partner, the parties dispute whether Gleason's compensation should be compared to *all* male Client Partners at Filter or just Dodson. (*See id.* at 23-25; Pl.'s Resp. at 15-17.)

#### a.    Applicable Law

"[T]he proper test for establishing a prima facie case in a professional setting . . . is whether the plaintiff is receiving lower wages than the average of wages paid to all employees of the opposite sex performing substantially equal work and similarly situated with respect to any other factors, such as seniority, that affect the wage scale." *Hein*, 718 F.2d at 916 (citations omitted). Courts "look critically upon the use of a single comparator to make out a prima facie case." *Id.* at 918. "However, use of a single comparator is not clearly erroneous unless an

---

[18] At oral argument, Gleason clarified that she does not allege a pay equity claim based on her short time in the position of Senior Account Director between her roles as an Engagement Manager and Client Partner.

appropriate comparator is wrongly excluded from comparison with the plaintiff." *Id.* (citations omitted).

An employer may not discriminate "in the payment of wages to employees *within a single establishment*[.]" *Bartelt v. Berlitz Sch. of Languages of Am., Inc.*, 698 F.2d 1003, 1005 (9th Cir. 1983) (citing 29 U.S.C. § 206(d)). The applicable regulation explains:

> (a) . . . [T]he term "establishment" had acquired a well settled meaning by the time of enactment of the Equal Pay Act. It refers to a distinct physical place of business rather than to an entire business or "enterprise" which may include several separate places of business. Accordingly, each physically separate place of business is ordinarily considered a separate establishment.

> (b) . . . [U]nusual circumstances may call for two or more distinct physical portions of a business enterprise being treated as a single establishment. For example, a central administrative unit may hire all employees, set wages, and assign the location of employment; employees may frequently interchange work locations; and daily duties may be virtually identical and performed under similar working conditions.

29 C.F.R. § 1620.9.

"[G]eographically separate offices may be treated as a single establishment where they are operationally interrelated." *Davis v. Inmar, Inc.*, No. 21-cv-03779 SBA, 2022 WL 3722122, at *5 n.2 (N.D. Cal. Aug. 29, 2022) (collecting cases); *see also Foster v. Arcata Assocs., Inc.*, 772 F.2d 1453, 1464 (9th Cir. 1985) (noting that separate offices are not a single establishment if they "are geographically and operationally distinct" and collecting cases), *overruled on other grounds by Kennedy v. Allied Mut. Ins.*, 952 F.2d 262 (9th Cir. 1991); *Nanthavong v. United Parcel Serv., Inc.*, No. 2:23-cv-02670-DJC-DB, 2024 WL 626707, at *6 n.4 (E.D. Cal. Feb. 14, 2024) ("Even geographically separate offices in the same organization can be considered a single establishment for purposes of this requirement.") (citation omitted); *Winther v. City of Portland*, No. 3:91-cv-1232-JU, 1992 WL 696529, at *3 (D. Or. June 10, 1992) ("Courts not only look to

physical separation as a factor in determining whether employment facilities are a single establishment under the Equal Pay Act, but they also examine the amount and degree to which physically separate facilities interact.") (citations omitted), *aff'd*, 21 F.3d 1119 (9th Cir. 1994).

        **b.**      **Analysis**

Defendants argue that if the role of Client Partner serves as a comparator, then Gleason's compensation must be compared to that of all other male Client Partners, not only Dodson. (Defs.' Mot. at 23-25.) Gleason responds that Dodson is the only appropriate comparator because he was the only other sales employee in Oregon, and the EPA compares compensation at a single establishment. (Pl.'s Resp. at 15-16.)

The Court finds that material issues of fact remain regarding whether Filter's geographically separate offices were "operationally interrelated" and whether other Client Partners were part of a single establishment. (*Compare* First Gleason Dep. 104:13-21, 106:16-23, confirming that a Client Partner who was not physically located in Oregon would be assigned to the Nike account and that he visited the Nike campus to better understand the work; *id.* at 116:14-18, suggesting that Gleason was "doing the same list of responsibilities" as Client Partners in the Seattle office; Gleason Decl. ¶ 9, indicating that Gleason received training at Filter's Seattle office; Karami Decl. Ex. 5, indicating that Gleason's supervisors were based in the Seattle office; *with* Gleason Decl. ¶ 18, indicating that the off-site Client Partner never ended up performing any sales for Nike and that no Client Partner was assigned to the Nike account subsequently; First Gleason Dep. 186:11-18, describing that Gleason's job was different than other Filter employees because she worked on Nike's campus every day). For example, the record does not conclusively show that Client Partners frequently interchanged work locations, or that daily duties were virtually identical or performed under similar working conditions. *See Senne v. Kan. City Royals Baseball Corp.*, 591 F. Supp. 3d 453, 556-57 (N.D. Cal. 2022)

(denying the defendants' motion for summary judgment and concluding that "there are disputed facts" as to the "correct establishments"); *Doe v. Butler Amusements, Inc.*, 71 F. Supp. 3d 1125, 1140 (N.D. Cal. 2014) ("[T]he Court finds that factual questions remain that make summary judgment on this issue inappropriate. In particular, the evidence in the record relating to the functioning of the units to which Plaintiffs were assigned suggests that this case may present the unusual situation in which more than one physical location should be found to constitute a single establishment.") (citations omitted); *Russell v. Placeware, Inc.*, No. 3:03-cv-00836-MO, 2004 WL 2359971, at *8 (D. Or. Oct. 15, 2004) ("In the case at bar, the court finds material issues of fact regarding the single-establishment prong. Specifically, the record does not *conclusively* show that [the defendant]'s California office is operationally distinct from its Portland office."); *cf. Forsberg v. Pac. Nw. Bell Tel. Co.*, 622 F. Supp. 1150, 1153 (D. Or. 1985) (denying the defendant's motion to dismiss and concluding that the defendant's actions may be "sufficiently interrelated between employees in various location to constitute a single 'establishment' under the Equal Pay Act").

### 4.    Different Wages

As part of her prima facie case, Gleason bears the burden of establishing that she received different wages for equal work. *See Rizo*, 950 F.3d at 1222.

Throughout his employment at Filter, Dodson earned (1) an annual salary of $130,000, (2) four percent of gross profit in commission for all contract, contract-to-hire, direct-hire placements and Managed Team Services engagements begun after his assignment to an account, and (3) two percent of gross profit *growth* in commission over the same month of the prior year.[19] (Goldstein Decl. Exs. C-F.)

---

[19] In total, Dodson earned $253,240 in 2017 and earned $224,063 from January 2018 to his termination in July 2018. (Harnisch Decl. ¶ 7.)

Defendants do not dispute that Gleason received disparate wages from Dodson and other Client Partners in her role as an Engagement Manager.[20] (*See generally* Defs.' Mot.) Gleason earned a starting annual salary of $95,000, eligibility for a discretionary quarterly bonus of up to 3.75 percent of base pay for meeting performance objectives, and an annual profit-sharing bonus which varied. (*See* Kendall Decl. Ex. 15; Harnisch Decl. Ex. 6.) From September 2018 onward, Gleason received four percent gross profit commission on specific eligible Nike orders. (Karami Decl. Ex. 1 at 2.) Beginning on June 1, 2019, Gleason received 2.5 percent commission on any new or existing Nike contract.[21] (*Id.* at 5.)

Gleason also alleges that she received discriminatory pay once she became a Client Partner. (*See* Pl.'s Resp. at 16-17.) In March 2020, Gleason became a Client Partner and received a base annual salary of $150,000, with one percent commission of gross profit on current business units and six percent of gross profit from new business units.[22] (Harnisch Decl. ¶ 7; Harnisch Decl. Ex. 2.) Defendants assert that once Gleason became a Client Partner, she received the same commission structure as other Client Partners. (Defs.' Mot. at 26, citing Harnisch Decl. Ex. 2.) Defendants also argue that the Court should compare total compensation, not rates of commission. (*Id.* at 23-25; Defs.' Reply at 9-10.)

///

---

[20] Gleason does not argue that she received a discriminatory wage compared to the other Engagement Manager's compensation. (*See* Harnisch Decl. ¶ 5, indicating that the other Engagement Manager received an $80,000 salary and received less in total commissions, although the rate of commission is unclear; Karami EEOC Decl. ¶ 3, indicating that Gleason and Filter's Engagement Partner both began receiving four percent commission in June 2019.)

[21] As an Engagement Manager, Gleason earned $60,677 from her hiring in July 2018 through the end of 2018 and earned $211,891 in 2019. (Harnisch Decl. ¶ 7.)

[22] As a Client Partner, Gleason earned $175,379 from March 25, 2020, through the end of 2020, $264,628 in 2021, and $219,165 in 2022. (Harnisch Decl. ¶ 7.)

The Court concludes that the separate compensation components—salary and rates of commission—are the appropriate comparators, not total compensation. *See Spurbeck v. Wyndham Worldwide*, No. 2:20-cv-00346-RFB-NJK, 2022 WL 717925, at *9 (D. Nev. Mar. 9, 2022) ("Even if Plaintiff had or was able to show evidence of a pay disparity, she would need to contend with Defendants' evidence that indicates that Sales Representatives were paid the same commission rates."); *Isom v. JDA Software Inc.*, No. 12-cv-02649-PHX-JAT, 2015 WL 3953852, at *13 (D. Ariz. June 29, 2015) (explaining that "equal work for equal pay in a commission compensation structure requires looking to the commission rate, and not to the total commissions paid"); *Farina v. Compuware Corp.*, 256 F. Supp. 2d 1033, 1043-44 (D. Ariz. 2003) ("[The plaintiff] alleges that the *formula* for computing bonuses was inconsistent, with men receiving more favorable treatment in the calculation of bonuses. Because of the large value of the Amex transaction, Plaintiff did receive substantial compensation . . . . However, there is sufficient evidence for a jury to conclude that Defendant applied a different and less favorable formula in calculating Plaintiff's bonus than was applied to similarly situated men, and that the formula adversely affected her bonus compensation."); *see also Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 655 (4th Cir. 2021) (reversing the district court's dismissal where the plaintiff earned more in total wages based on a base salary plus commissions even though the defendant paid the plaintiff's comparator a higher annual base salary because "the statute says nothing about total wages; it places all the emphasis on wage *rates*").

Questions of fact remain. Although Gleason received a higher annual salary than Dodson when she became a Client Partner, she received different rates of commission. (*Compare* Goldstein Decl. Exs. C-F, Dodson received four percent of gross profit in commission for all contract, contract-to-hire, direct-hire placements and Managed Team Services engagements

begun after his assignment to an account, and two percent of gross profit growth in commission over the same month of the prior year; *with* Harnisch Decl. Ex. 2, Gleason received one percent commission of gross profit on current business units, and six percent of gross profit from new business units.) Even if the Court were to compare total compensation, questions of fact preclude entry of summary judgment in favor of Defendants. (*Compare* Harnisch Decl. ¶ 7, Dodson earned $224,063 in approximately six months in 2018; *with id.*, Gleason earned $264,628 in her highest paid year as a Client Partner.)

Viewing the evidence in the light most favorable to Gleason, a reasonable jury could find that Gleason and Dodson shared the same "overall job[,]" that Filter employees in Oregon were the only employees within the same "establishment," and that Gleason received less compensation than Dodson. Accordingly, Gleason has established her prima facie case at summary judgment. *See Freyd*, 990 F.3d at 1220; *see also Lono v. Haw. Pac. Univ.*, No. 22-cv-00400 JMS-WRP, 2024 WL 1117109, at *7 (D. Haw. Mar. 13, 2024) ("At this summary judgment stage, [the plaintiff] met her prima facie case under the EPA . . . ."). Accordingly, the Court turns to whether Defendants have established an affirmative defense.

### 5.    Affirmative Defense

"If the plaintiff puts forth a prima facie case of an EPA violation, 'the burden shifts to the employer to show that the differential is justified under one of the Act's four exceptions.'" *Rizo*, 950 F.3d at 1222 (quoting *Corning Glass Works*, 417 U.S. at 196). "To counter a prima facie case, an employer must prove 'not simply that the employer's proffered reasons *could* explain the wage disparity, but that the proffered reasons *do in fact* explain the wage disparity.'" *Id.* (citations omitted). The EPA's statutory exceptions include that an employer may offer differential pay "based on any other factor other than sex[.]" 29 U.S.C. § 206(d)(1).

Defendants argue that the Engagement Manager position was created with the intent of stabilizing the Nike business, not for sales, and thus the incentive plan provided compensation for meeting performance goals rather than providing standard commissions for sales. (Defs.' Mot. at 25.) A genuine issue of fact remains because Filter did eventually pay Gleason commissions for sales.

Defendants also contend that Dodson was paid highly because he was responsible for explosive growth in the Nike account. (*Id.*) However, given that Filter set Dodson's compensation when he was first hired, the facts bely the suggestion that Dodson was compensated at a higher salary and commission rate because of his successes for the company. *Cf. Isom*, 2015 WL 3953852, at *13 (explaining that "equal work for equal pay in a commission compensation structure requires looking to the commission rate, and not to the total commissions paid").

Defendants argue that Gleason's "long track record of conflict with coworkers and supervisors" hampered her performance and provides a non-discriminatory reason for the difference in pay. (Defs.' Mot. at 26.) Gleason responds that there is no evidence that she ever received any warnings, performance improvement plans, or was found to have violated policies, and no evidence that any conflict hampered her performance or justified paying her less.[23] (Pl.'s Resp. at 19-20.) There is no evidence in the record that Defendants based any compensation decisions on Gleason's interpersonal conflicts or job performance. Instead, Defendants acknowledge that they promoted Gleason twice. (Defs.' Mot. at 8-9, stating that Gleason was "promoted" to the positions of Senior Account Director and then Client Partner; *see also* Defs.' Reply at 11.) The Court concludes that, at summary judgment, Defendants have not met their

---

[23] Gleason further points out that Dodson himself was fired for misconduct. (Pl.'s Resp. at 20.)

burden of establishing that Gleason's conflicts "factored into [the] salary determinations." *Lono*, 2024 WL 1117109, at *8 (citation omitted); *see also Rizo*, 950 F.3d at 1222 ("To counter a prima facie case, an employer must prove 'not simply that the employer's proffered reasons *could* explain the wage disparity, but that the proffered reasons *do in fact* explain the wage disparity.'") (citations omitted).

Defendants further suggest that any difference in compensation between Client Partners was due to business necessity because of the size of the Nike account. (Defs.' Mot. at 19-20.) In Gleason's deposition, defense counsel asked why Gleason believed that other members of the sales and growth team received a different compensation package than she did. (*See* Dep. Meagan Gleason ("Second Gleason Dep.") 136:17-138:1, Sept. 20, 2023.)[24] Gleason responded, "the only thing I can assume is that this account rapidly grew, and . . . they were going to have to pay me a lot of money that they probably didn't want to, leading up to acquisition and then post acquisition, when there were very specific dates and gates of revenue and [earnings before interest, taxes, depreciation, and amortization] numbers that they had to hit." (*Id.* at 138:2-8; *see also* Holmes Dep. 16:23-17:7, noting that he remembered discussions about reducing Gleason's commission percentage because of the size of the Nike account but that he did not know if that ever occurred.) However, Defendants concede that Dodson "was paid highly during his tenure because he was responsible for explosive growth in the Nike account." (Defs.' Mot. at 25.) Thus, questions of fact remain as to whether rapid growth factored into the compensation determination.[25]

---

[24] Excerpts from Gleason's second deposition transcript are available at Kendall Decl. Ex. 3, ECF No. 70-3, and Second Kendall Decl. Ex. 3, ECF No. 87-3.

[25] Defendants argue that Gleason must prove that Defendants' reasons other than sex for any difference in pay are pretextual. (*See* Defs.' Mot. at 26-27.) However, for an EPA wage discrimination claim, "[n]o showing of pretext is required." *Rizo*, 950 F.3d at 1223.

The Court concludes that genuine disputes of material fact remain as to whether Gleason can establish a prima facie wage discrimination case under the EPA and whether Defendants can establish an affirmative defense. Therefore, the Court denies Defendants' motion for summary judgment on Gleason's EPA wage discrimination claim.

### B.    OEPA

The OEPA also prohibits discriminatory wages. Before January 1, 2019, Oregon Revised Statutes § 652.220(1)(b) made it an unlawful employment practice to "[p]ay wages to any employee at a rate less than that at which the employer pays wages to employees of the opposite sex for work of comparable character, the performance of which requires comparable skills." *See Freyd*, 990 F.3d at 1223 (applying the 2017 version).

As of January 1, 2019, the OEPA now makes it an unlawful employment practice to "[p]ay wages or other compensation to any employee at a rate greater than that at which the employer pays wages or other compensation to employees of a protected class for work of comparable character" and defines "work of comparable character" to mean "work that requires substantially similar knowledge, skill, effort, responsibility and working conditions in the performance of work, regardless of job description or job title." OR. REV. STAT. § 652.210(16) (2022); *id.* § 652.220(1)(b) (2020); *see also Jost v. Synopsis, Inc.*, No. 3:21-cv-01793-HZ, 2022 WL 3083722, at *2 (D. Or. Aug. 1, 2022) (explaining that under the OEPA, "Plaintiff need not allege facts indicating that Defendants intended to discriminate against him; he need only allege facts showing that other employees who are not members of his protected class received compensation at a greater rate for comparable work." (citing *Smith v. Bull Run Sch. Dist. No. 45*, 722 P.2d 27, 29 (Or. Ct. App. 1986))). In 2019, the Oregon legislature also "remove[d] the broad 'factor other than sex' affirmative defense from the statute." *Freyd*, 990 F.3d at 1223 (citing OR. REV. STAT. § 652.220 (2019)).

PAGE 38 – OPINION AND ORDER

"Evaluations of work of comparable character need only consider comparisons of *Oregon* employees . . . ." OR. ADMIN. R. 839-008-0010(2) (emphasis added); *see also O'Donnell v. Ameresco, Inc.*, No. 3:23-cv-00085-AN, 2024 WL 531715, at *6 (D. Or. Feb. 9, 2024) (concluding that Oregon employees, not sales managers in different geographical regions, are the proper comparators under the OEPA).

Under both the 2017 and the 2019 versions of the statute and for similar reasons discussed above, the Court concludes that a genuine issue of material fact remains as to Gleason's OEPA claim. *See Freyd*, 990 F.3d at 1223 ("Because Oregon courts have declared that 'comparable work' is a more inclusive standard than 'substantially equal work,' we conclude that [the plaintiff] has raised a genuine issue of material fact under § 652.220 for the same reasons she has done so under the Equal Pay Act." (citing *Bureau of Lab. & Indus. v. City of Roseburg*, 706 P.2d 956, 959 n.2 (Or. Ct. App. 1985))). Therefore, the Court denies Defendants' motion for summary judgment on Gleason's OEPA wage discrimination claim.

### C.    Failure to Pay Wages Upon Termination

Gleason asserts that Defendants failed to pay her wages "that she should have received but for the discriminatory wage practices" upon termination in violation of Oregon Revised Statutes §§ 652.140 to 652.150. (SAC at 21-22.) Defendants acknowledge that if Gleason's OEPA claim survives summary judgement, so too should her unpaid wage claim. (Defs.' Mot. at 34.)

Gleason also asserts that she has an independent claim for wages above what she seeks from her OEPA claim. (*See* Pl.'s Resp. at 25.) Gleason alleges that, in January 2019, Filter "reduced Ms. Gleason's compensation by approximately fifty percent by crediting . . . new business sales to a different Filter employee who did not generate the sales." (SAC ¶ 18.) According to Gleason, in January 2019 an employee returned from family leave and received

commissions on statements of work that Gleason wrote, negotiated, developed, and closed. (*See* Gleason Decl. ¶ 27.) She cross-references a highlighted spreadsheet documenting the accounts on which she worked. (*See* Gleason Decl. Ex. E, ECF No. 93.) Defendants argue that the spreadsheet does not support an inference that Filter paid another employee commission owed to Gleason. (Defs.' Reply at 12.)

The Court concludes that a genuine dispute of material fact remains on the issue of the challenged commission. (*See* Gleason Decl. ¶ 27; *compare* Goldstein Decl. Ex. Y, EEOC Decl. Terry Harnisch ¶ 2, ECF No. 91, stating that the other employee generated business on the Nike account and earned commission in 2018 and 2019; *with* Harnisch Dep. 70:16-72:15, suggesting that the employee was hired too late in 2018 to generate revenue and admitting that she did not know whether the employee generated any business on the Nike account in 2018.)

For these reasons, the Court denies Defendants' motion for summary judgment on Gleason's claim for failure to pay wages upon termination.

### D.    Title VII

#### 1.    Applicable Law

Under Title VII, it is unlawful for a covered employer to discriminate against any individual based on sex. *See* 42 U.S.C. § 2000e-2(a) ("It shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin").

"When responding to a summary judgment motion in a discrimination suit under . . . Title VII, the plaintiff may proceed by either using the *McDonnell Douglas* framework, as established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 . . . (1973), or alternatively, may simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely

than not motivated the defendant's contested conduct." *Opara v. Yellen*, 57 F.4th 709, 721 (9th Cir. 2023) (simplified).

Under the burden-shifting analysis of *McDonnell Douglas*, "[t]he employee must first establish a prima facie case of discrimination." *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008). A prima facie case of discrimination "requires a showing that (1) she is a member of a protected class; (2) she was qualified for her position; (3) she experienced an adverse employment action; and (4) similarly situated individuals outside her protected class were treated more favorably." *Freyd*, 990 F.3d at 1228 (simplified). "The requisite degree of proof necessary to establish a *prima facie* case for Title VII . . . claims on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." *Davis*, 520 F.3d at 1089 (quoting *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994), *as amended on denial of reh'g* (July 14, 1994)).

If the employee establishes a prima facie case, "the employer must articulate a legitimate, nondiscriminatory reason for the challenged action." *Id.* at 1089. "Finally, if the employer satisfies this burden, the employee must show that the reason is pretextual either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* (simplified). "While intent is not relevant to a disparate impact theory of recovery, the disparate treatment theory does require proof of discriminatory intent." *Freyd*, 990 F.3d at 1228 (citing *Garcia v. Spun Steak Co.*, 998 F.2d 1480, 1484 (9th Cir. 1993)).

///

///

///

2.        **Analysis**

Gleason alleges that she received "[d]isparate [t]reatment" in her compensation.[26] (SAC at 16-17.) Defendants argue that Gleason's claim fails because she has not identified any evidence of discriminatory intent. (Defs.' Mot. at 27.) Gleason responds that evidence that Defendants paid her male predecessor more for the same work, knew that they paid Gleason less, and persisted in the practice is sufficient evidence to establish a prima facie case. (Pl.'s Resp. at 21-22.)

Defendants seem to suggest that Gleason must present direct or circumstantial evidence of discriminatory motive to establish a prima facie case. However, although Gleason ultimately bears the burden of establishing discriminatory motive, it is clear that Gleason may use the *McDonnell Douglas* framework to establish a prima facie case. *See Watson v. City of Henderson*, No. 2:20-cv-01761-CDS-BNW, 2024 WL 1514983, at \*10 (D. Nev. Apr. 5, 2024) ("Because she fails to provide direct discrimination evidence, [the plaintiff] must satisfy the *McDonnell Douglas* factors for her claim to survive."); *Redwind v. W. Union, LLC*, No. 3:14-cv-01699-AC, 2016 WL 3606595, at \*12 (D. Or. May 2, 2016) ("[The plaintiff] produces no direct evidence of discriminatory animus, so she must prove her case through circumstantial evidence and the three-step, burden shifting framework."), *finding and recommendations adopted*, 2016 WL 3410183 (D. Or. June 16, 2016), *aff'd sub nom.*, 698 F. App'x 346 (9th Cir. 2017); *cf. Opara*, 57 F.4th at 722 ("Nothing compels reliance on the *McDonnell Douglas* factors to establish a prima facie

---

[26] Gleason's Title VII discriminatory treatment claim challenges only her rates of commission and salaries. (*See* SAC at 16-17.) She does not otherwise allege that she suffered sex discrimination with respect to the terms or conditions of her employment. *Cf. Muldrow v. City of St. Louis, Mo.*, 144 S. Ct. 967, 971-72 (2024) (discussing sex discrimination with respect to the terms or conditions of employment).

case; a plaintiff may alternatively offer direct or circumstantial evidence of discriminatory

motive to establish her prima facie case.") (citations omitted).

Here, Gleason presents evidence that she is a member of a protected class, was qualified

for her position, and received lower compensation rates than Dodson. (*See* First Gleason Dep.

116:14-18; Gleason Decl. Ex. H at 2; Goldstein Decl. Exs. C-F; Kendall Decl. Ex. 15; Harnisch

Decl. Ex. 6; Karami Decl. Ex. 1 at 2-6); *see Campbell v. Haw. Dep't of Educ.*, 892 F.3d 1005,

1012 (9th Cir. 2018) ("For claims of disparate treatment under Title VII, an adverse employment

action is one that 'materially affects the compensation, terms, conditions, or privileges of

employment.'" (quoting *Davis*, 520 F.3d at 1089)). She also presents evidence that similarly

situated individuals outside her protected class were treated more favorably because the record

suggests that Defendants were aware of her sales work, Gleason reported the difference in

compensation, and Defendants did not align her compensation with Dodson's despite Gleason's

negotiations. (*See* First Gleason Dep. 116:14-18, "I told [my supervisor] that it wasn't legal to

have me do that job and not pay me the same as the other men that were . . . doing the same list

of responsibilities in the Seattle office"; *see also id.* at 119:20-25; Karami Decl. Ex. 1 at 2-6); *cf.*

*Freyd*, 990 F.3d at 1229 (affirming grant of summary judgment on the plaintiff's Title VII

disparate treatment claim where the plaintiff had not presented any evidence "that [the

plaintiff]'s comparators were treated 'more favorably' than was [the plaintiff] in this context"

because the plaintiff's "comparators engaged in retention negotiations with the University and

were granted substantial salary increases as a result" while the plaintiff "never engaged in

retention negotiations").

The Court concludes that Gleason has presented a prima facie case. *See Israel v. U.S.*

*Bank, NA*, 653 F. Supp. 3d 685, 694 (D. Ariz. 2023) (concluding that the plaintiff had made out a

prima facie case under the burden shifting framework); *Horschel v. Haaland*, No. 4:18-cv-0006-HRH, 2022 WL 1693585, at *8-9 (D. Alaska May 26, 2022) (same).

Thus, the burden shifts to Defendants to articulate a legitimate, non-discriminatory reason for the difference in compensation. Defendants state that Gleason's role was created with the intent of stabilizing the Nike business and Gleason's "long track record of conflict with coworkers and supervisors . . . provide[s] a non-discriminatory reason for difference in pay." (Defs.' Mot. at 25-27.) The Court concludes that Defendants have satisfied their burden of offering at least one legitimate, non-discriminatory reason for the compensation delta. *See James v. Dependency Legal Grp.*, 253 F. Supp. 3d 1077, 1096 (S.D. Cal. 2015) (concluding that caseloads, the team, and training needs provided a legitimate, non-discriminatory basis for transferring the plaintiff); *cf. Crowe v. Wormuth*, 74 F.4th 1011, 1036 (9th Cir. 2023) ("[I]nstances of workplace misconduct such as these quite plainly satisfy the [defendant]'s burden to produce evidence of valid, non-discriminatory reasons for terminating an employee.").

Accordingly, the burden shifts to Gleason to show pretext. Gleason has not pointed to any direct evidence of discriminatory motive. However, viewing the evidence in the light most favorable to Gleason, a reasonable jury could conclude that Defendants' reasons for lower compensation are unworthy of credence because Defendants eventually paid Gleason commission (albeit at a lower rate than Dodson), suggesting that Gleason's role was not merely for account stabilization, and because there is no evidence that she received any discipline or that her personal conflicts factored into her compensation package. "At the summary judgment stage, . . . inconsistency is sufficient to show pretext, and determining the credibility of the statements is a task for the jury." *Israel*, 653 F. Supp. 3d at 694; *see also Opara*, 57 F.4th at 724 ("[T]he Supreme Court has instructed that 'a plaintiff's prima facie case, combined with . . . evidence . . .

that the employer's asserted justification is *false*, may' be enough" (quoting *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 148 (2000))); *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008) ("As a general matter, the plaintiff in an employment discrimination action need produce very little evidence in order to overcome an employer's motion for summary judgment." (quoting *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1124 (9th Cir. 2000))); *E.E.O.C. v. Inland Marine Indus.*, 729 F.2d 1229, 1235 (9th Cir. 1984) ("By refusing to change his subjective wage-setting policies or to bring black [employees'] wages in line with those of white[ employees], [the defendant supervisor] ratified the existing disparities. His ratification constituted all the intent the court needed to find [the defendant company] guilty on a disparate treatment theory.") (citations omitted); *Morgan v. U.S. Soccer Fed'n, Inc.*, 445 F. Supp. 3d 635, 665 (C.D. Cal. 2020) ("A rational fact finder could infer that the disparity . . . and Defendant's weak explanations for these discrepancies, gives rise to an inference of discriminatory motive." (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993))).

For these reasons, the Court denies Defendants' motion for summary judgment on Gleason's Title VII wage discrimination claim.

## III.    RETALIATION CLAIMS

Gleason alleges that Defendants retaliated against her in violation of the EPA (29 U.S.C. § 206(d)), Title VII (42 U.S.C. § 2000e-3(a)), and Oregon Revised Statutes § 659A.030. (*See* SAC at 14-18, 20-21, claims two, four, and six.) Before the Court are cross motions for summary judgment. Defendants move for summary judgment on all three claims. (Defs.' Mot. at 28-34.) Gleason moves for summary judgment on the EPA and Title VII claims, claims two and four, and limits her analysis to her claim of retaliatory *termination*. (Pl.'s Mot. at 2-16.)

///

PAGE 45 – OPINION AND ORDER

### A.    Applicable Law

"The analysis for retaliation under Title VII and under the Equal Pay Act are essentially the same and thus will be discussed simultaneously." *Traver v. Tucson Unified Sch. Dist.*, No. 05-cv-319-TUC-CKJ, 2008 WL 11449298, at *2 (D. Ariz. Mar. 4, 2008), *aff'd*, 376 F. App'x 799 (9th Cir. 2010). Further, "[b]ecause Oregon based ORS § 659A.030 on Title VII, courts analyze the claims together." *Karthauser v. Columbia 9-1-1 Commc'ns Dist.*, 647 F. Supp. 3d 992, 1006 (D. Or. 2022) (citing, *inter alia*, *Dawson v. Entek Int'l*, 630 F.3d 928, 935 (9th Cir. 2011)).

To establish a Title VII retaliation claim, a plaintiff must prove that "1) [the plaintiff] engaged in a protected activity; 2) [the plaintiff] suffered an adverse employment decision; and 3) there was a causal link between the protected activity and the adverse employment decision[.]" *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1064 (9th Cir. 2002) (citation omitted); *see also Flores v. Robin*, No. 1:17-cv-00396-LJO-SKO, 2018 WL 460547, at *2 (E.D. Cal. Jan. 18, 2018) (discussing the similar prima facie case under the EPA) (citations omitted). "Protected activity includes the filing of a charge or a complaint, . . . as well as engaging in other activity intended to 'oppose[ ]' an employer's discriminatory practices." *Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1197 (9th Cir. 2003) (citing 42 U.S.C. § 2000e-3(a)), *op. am. on denial of reh'g*, No. 00-35999, 2003 WL 21027351 (9th Cir. May 8, 2003).

Title VII's anti-retaliation provision "applies only when the retaliatory action is 'materially adverse,' meaning that it causes 'significant' harm." *Muldrow*, 144 S. Ct. at 976 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). "The test was meant to capture those (and only those) employer actions serious enough to 'dissuade[ ] a reasonable worker from making or supporting a charge of discrimination.'" *Id.* (quoting *White*, 548 U.S. at 68); *see also Ray v. Henderson*, 217 F.3d 1234, 1237 (9th Cir. 2000) (holding that

PAGE 46 – OPINION AND ORDER

"an adverse employment action is adverse treatment that is reasonably likely to deter employees from engaging in protected activity").

"Title VII retaliation claims must be proved according to traditional principles of but-for causation . . . . This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013); *see also Lindsey v. Clatskanie People's Util. Dist.*, 140 F. Supp. 3d 1077, 1088 (D. Or. 2015) (explaining that Oregon Revised Statutes § 659A.030 also uses a but-for standard (citing *Hardie v. Legacy Health Sys.*, 6 P.3d 531, 538 (Or. Ct. App. 2000))). "The causal link between a protected activity and the alleged retaliatory action 'can be inferred from timing alone' when there is a close proximity between the two." *Thomas v. City of Beaverton*, 379 F.3d 802, 812 (9th Cir. 2004) (quoting *Villiarimo*, 281 F.3d at 1065); *see also Ferrara v. Mayorkas*, No. 22-55766, 2024 WL 1947134, at *1 (9th Cir. May 3, 2024) ("Here, the approximately three-month period between [the plaintiff]'s settling her EEOC complaint and the adverse employment actions she experienced is sufficiently proximate for a jury to infer causation." (citing *Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 731-32 (9th Cir. 1986) and *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987))).

"If a plaintiff has asserted a prima facie retaliation claim, the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for its decision." *Ray*, 217 F.3d at 1240 (citing *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1464-65 (9th Cir. 1994)). "If the defendant articulates such a reason, the plaintiff bears the ultimate burden of demonstrating that the reason was merely a pretext for a discriminatory motive." *Id.* (citing *Steiner*, 25 F.3d at 1464-65).

///

PAGE 47 – OPINION AND ORDER

### B.    Analysis

Gleason argues that she engaged in multiple protected activities: reporting that "she was being paid less than her male predecessor Dodson" in August or September 2018; reporting to human resources that she felt like a supervisor, Adams, treated her differently because she was a woman in February 2020; filing a charge with the EEOC in July 2020; filing the instant lawsuit in December 2021; and reporting retaliation on March 15, 2023. (Pl.'s Mot. at 3, 12-13; Pl.'s Resp. at 22.) As a result, Gleason alleges that she suffered numerous adverse employment actions: she received comparatively less pay than "other employees who had not complained of pay discrimination;" she was demoted to the positions of Client Partner and then Enterprise Business Development Manager and received attendant losses of income; she experienced "loss of responsibilities, autonomy, and opportunity for professional growth;" she experienced "diversion of commissions from [Gleason] to male employees who did not perform the work to entitle them to those commissions;" she suffered "other deprivations of income to which [Gleason] was otherwise entitled;" and ultimately Defendants terminated her. (SAC ¶¶ 54-55.)

Defendants argue that Gleason's termination is the only adverse employment action taken against her. (Defs.' Mot. at 30-31.) The Court first considers Gleason's alleged retaliatory adverse employment actions suffered during her employment and then turns to her termination.

### 1.    Other Alleged Adverse Employment Actions

#### a.    July 2018 Transfer of Responsibilities

Defendants argue that the transfer of sales responsibilities and opportunities to the male off-site Client Partner during Gleason's first few weeks at Filter was not an adverse employment action taken in retaliation for protected activity. (*Id.* at 33.) Gleason does not respond to Defendants' argument. The Court concludes that Gleason has not pointed to evidence that she engaged in any protected activity *before* the transfer and thus cannot establish a causal link

between protected activity and the transfer of responsibilities. *See Manzo v. Laborers Int'l Union of N. Am.*, 348 F. App'x 267, 268 (9th Cir. 2009) ("[The plaintiff] has failed to establish a prima facie case for retaliation because she did not engage in protected activity prior to [the adverse employment action]."). The Court grants Defendants' motion for summary judgment on Gleason's July 2018 transfer of responsibilities theory of retaliation.

### b. Move to Client Partner

Gleason suggests that her demotion and low commission rate when Defendants moved her to the Client Partner role in March 2020 was an adverse employment action. (Pl.'s Resp. at 23-24.) Defendants argue that Gleason's move to the position of Client Partner was, in fact, a promotion and was not an adverse employment action because Gleason wished to perform a sales role, her new commission structure as a Client Partner offered Gleason more earning potential, and Gleason did in fact make more money as a Client Partner. (Defs.' Mot. at 30-32); *but see Williams v. Robert Half Int'l Inc.*, No. 20-cv-03989-KAW, 2023 WL 6302315, at *10 (N.D. Cal. Sept. 27, 2023) (noting that even though the plaintiff's new role "catered to her strengths at the same base salary of $150,000 and with unlimited commission potential" and the plaintiff "had the opportunity to make more money in this role than in any previous position she held at [the company]" her change in role "was clearly a demotion despite [the defendant]'s effort to establish otherwise").

Regardless of whether the move to Client Partner constituted an adverse employment action, Gleason cannot establish a causal link between protected activity and the action. Gleason does not explain how the Court can draw a causal link between her summer 2018 report of receiving lower compensation and the March 2020 change in roles. *See Porter v. Mabus*, No. 1:07-cv-0825 AWI SMS, 2014 WL 4436303, at *4 (E.D. Cal. Sept. 9, 2014) ("Even a lapse of six or eight months between knowledge of the protected activity and the adverse employment

action is too much distance to permit an inference of causation based on timing." (citing *Govan v. Sec. Nat'l Fin. Corp.*, 502 F. App'x 671, 674 (9th Cir. 2012) and *Woods v. Washington*, 475 F. App'x 111, 113 (9th Cir. 2012))).

There is evidence in the record that, in February 2020, Gleason reported to human resources that she felt like Adams treated her differently because she was a woman. (*See* Goldstein Decl. Ex. Q.) However, Gleason has not established that the decision-makers who transferred her to the role of Client Partner *knew* of her report. *See Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 797 (9th Cir. 1982) ("[A]t the time [the district manager] made the decision that directly resulted in the adverse action against [one of the plaintiffs], he did not know that she had engaged in a protected activity. This breaks the requisite causal link . . . .").

The Court grants Defendants' motion for summary judgment on Gleason's move to Client Partner theory of retaliation.

### c.     Move to Enterprise Business Development Manager

Defendants argue, and the record reveals, that Gleason received a salary increase when her internal title changed from Client Partner to Enterprise Business Development Manager. (Defs.' Mot. at 31; *see* Harnisch Decl. Ex. 2, Gleason earned a $150,000 salary as a Client Partner, with one percent commission of gross profit recognized in the month and six percent of gross profit from new business units; Harnisch Decl. ¶ 7, Gleason earned $219,165 total compensation in 2022 as a Client Partner; Scott Decl. Ex. 1 at 1-2, Gleason earned a $225,000 salary and was eligible for a bonus of up to ten percent as an Enterprise Business Development Manager.) In her client-facing role, Gleason retained the Client Partner title. (*See* Scott Dep. 17:3-18:13.) With the change in internal title, Gleason became the highest paid Filter employee. (*See* Harnisch Decl. ¶ 8; Gaughran Decl. ¶ 4.) There is no evidence that Gleason's job responsibilities or the conditions of her employment immediately changed. Gleason does not

respond to Defendants' argument, and the Court agrees with Defendants that the change in title would not dissuade a reasonable employee from making or supporting a charge of discrimination and did not constitute an adverse employment action. *See Gardner v. Braithwaite*, 607 F. Supp. 3d 1106, 1123 (S.D. Cal. 2022) (concluding that change in supervision would not dissuade a reasonable worker from making or supporting a charge of discrimination); *cf. Brooks v. City of San Mateo*, 229 F.3d 917, 929 (9th Cir. 2000) ("Transfers of job duties . . . , if proven, would constitute adverse employment decisions cognizable under Title VII.") (simplified). The Court grants Defendants' motion for summary judgment on Gleason's move to Enterprise Business Development Manager theory of retaliation.

### d.    March 14, 2023, Responsibility Shift

Gleason argues that her loss of responsibilities on March 14, 2023, constituted an adverse employment action. (Pl.'s Resp. at 23-24.) Gleason argues that "removal of the core duty of drafting the Nike renewal contracts" on March 14, 2023, was an adverse employment action because it materially affected the terms or conditions of her employment. (*Id.* at 24.) Further, Gleason argues that Gaughran, her supervisor, became aware of the instant lawsuit less than a year before he removed and reassigned her core responsibilities. (*Id.*) Accordingly, Gleason asserts that causation can be implied by the temporal proximity of the events. (*Id.*)

The Court concludes that Gleason has not met her burden of establishing causation based on the vague timeline that Gaughran became aware of her lawsuit less than a year before he reassigned her responsibilities. (*See* Gaughran Dep. 34:12-20, testifying that he became aware of the lawsuit a number of months after he started managing her, sometime in 2022); *see Manzo*, 348 F. App'x at 269 ("[W]hile [the plaintiff] vaguely alludes to the timing of the alleged protected action and retaliatory employment decision, she makes no demonstration of reasonable inferences as to timing . . . ."); *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1035 (9th

Cir. 2006) (affirming grant of summary judgment because the eight-month gap was too great to support an inference of causation); *Porter*, 2014 WL 4436303, at *4 ("Even a lapse of six or eight months between knowledge of the protected activity and the adverse employment action is too much distance to permit an inference of causation based on timing." (citing *Govan*, 502 F. App'x at 674 and *Woods*, 475 F. App'x at 113)).

Even if Gleason could establish her prima facie case, Defendants articulated a non-discriminatory reason for the change in responsibilities—prior problems with contract renewals and the company's desire to get more people involved (*see* Defs.' Reply at 11; Gaughran Dep. 67:15-68:24)—and Gleason has not explained why those reasons are pretext for discriminatory motive. The Court grants Defendants' motion for summary judgment on Gleason's responsibility shift theory of retaliation.

### 2.    Gleason's Termination

Defendants acknowledge that Gleason's termination was an adverse employment action. (*See* Defs.' Mot. at 30.) Gleason argues that the temporal proximity between her March 15, 2023, report of retaliation and her April 24, 2023, termination provides circumstantial evidence of causation and that the reasons stated for her termination were pretextual. (Pl.'s Mot. at 11-16.)

### a.    Causation

First, Defendants argue that Gleason cannot establish the element of causation because at least one of the reasons for Gleason's termination had already occurred before the protected activity—Gleason's conflict with other employees. (Defs.' Resp. Pl.'s Mot. ("Defs.' Resp.") at 6, ECF No. 86.) Defendants imply that the fact that Gleason already had conflicts with other employees supports the inference that Defendants' decision-making process to terminate Gleason was already underway prior to Gleason's March 15 report of retaliation. (*Id.*, quoting *Cohen*, 686 F.2d at 797 ("[A]t the time [the district manager] made the decision that directly resulted in the

adverse action against [one of the plaintiffs], he did not know that she had engaged in a protected activity. This breaks the requisite causal link . . . .") and *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) ("Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality.").)

Defendants' suggestion that they made the decision to terminate Gleason before Gleason's March 15, 2023, email is not supported by the record. There is no evidence in the record that Defendants discussed terminating Gleason or implemented any other disciplinary measures before March 15, 2023. (*See* Pl.'s Reply Defs.' Resp. ("Pl.'s Reply") at 8-9, ECF No. 99.) To the contrary, the evidence suggests that Defendants anticipated that Gleason would remain employed. (*See* Kendall Decl. Ex. 5, anticipating Gleason's ongoing employment on March 14, 2023; Gaughran Dep. 61:13-62:25, describing Gleason's anticipated responsibilities following the March 14 meeting; Ryan Dep. 45:11-13, 46:15-47:5, testifying that Defendants discussed terminating Gleason a few days before April 24, 2023, and decided to terminate Gleason on April 24, 2023.)

Second, Defendants argue that Gleason's March 15, 2023, email restated the allegations that she raised in her July 2020 EEOC charge and in her original complaint in the instant lawsuit. (Defs.' Resp. at 7.) Defendants argue that the fact that Defendants did not take any adverse action against Gleason between July 2020 and spring 2023 undercuts Gleason's causation argument. (*Id.*)

Defendants cite *Taylor v. AFS Technologies, Inc.* in support of their argument that the lack of any adverse employment actions between July 2020 and spring 2023 undercuts Gleason's reliance on temporal proximity in this case. (*Id.*); *see Taylor v. AFS Techs., Inc.*, No. 09-cv-

2567-PHX-DGC, 2011 WL 1237609, at *5 (D. Ariz. Apr. 4, 2011), *aff'd*, 503 F. App'x 531 (9th Cir. 2013). In *Taylor*, "Plaintiff first complained about race discrimination in early March 2009." *Id.* "He experienced no alleged adverse action until five months later, when he was denied a raise in late August 2009." *Id.* The plaintiff again complained of discrimination on November 11, 2009, and on November 24, 2009, was given additional duties and a disciplinary notice and was terminated on November 25, 2009. *Id.* at *4. The court concluded that the temporal proximity between March and August was insufficiently close to infer causation. *Id.* at *5. Further, after the plaintiff's initial complaint of discrimination, "[t]he first alleged adverse action happened more than five months later, undermining the inference of retaliatory motive arising from the close proximity between the complaints made on November 11, 2009 and subsequent adverse actions." *Id.*

The Court finds *Taylor* persuasive. Given the large intervening period following Gleason's July 2020 and December 2021 protected actions and the first subsequent adverse employment action, Gleason's reliance on temporal proximity alone is insufficient.[27] However, Gleason also points to Defendants' alleged failure to investigate her report of retaliation, contrary to company policy, as evidence of the causal link. (*See* Pl.'s Mot. at 10, 14; Ryan Dep. 29:19-30:18, 34:18-25.) Accordingly, the Court assumes without deciding that Gleason has established her prima facie case.

### b.     Non-Discriminatory Basis

Assuming Defendants' failure to investigate in combination with the temporal proximity to protected activity satisfied Gleason's burden of showing causation, Defendants, through their

---

[27] Ryan, a human resource lead with Dentsu, terminated Gleason's employment. Unlike with Gaughran, Gleason does not suggest that Ryan had recently learned of Gleason's protected activity.

Rule 30(b)(6) witness, Ryan, have pointed to non-discriminatory reasons for Gleason's termination: internal relationship issues with two coworkers, her failure to follow Ryan's instruction not to communicate with clients while out on leave, and her failure to follow Defendants' leave protocol.[28] (*See* Ryan Dep. 51:1-16, 59:23-61:3); *see Vasquez v. Cnty. of L.A.*, 349 F.3d 634, 641 (9th Cir. 2003), *as amended* (Jan. 2, 2004) ("[The director] proffered a legitimate, non-discriminatory reason for her decision to transfer [the plaintiff] to a field position and to issue the warning letter: [the plaintiff] disobeyed a direct order from his supervisor. Therefore, [the plaintiff] must prove that [the director's] reason is pretextual.").[29]

### c.    Pretext

Gleason "retains the ultimate burden of persuading the trier of fact that [s]he has been the victim of intentional discrimination." *USW Local 12-369 v. USW Int'l*, 728 F.3d 1107, 1118 (9th Cir. 2013) (simplified). "[C]ourts only require that an employer honestly believed its reason for its actions, even if its reason is foolish or trivial or even baseless. *Villiarimo*, 281 F.3d at 1063 (simplified); *see also Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1113 (9th Cir. 2003) ("A factfinder may infer the ultimate fact of retaliation without proof of a discriminatory reason if it rejects a proffered nondiscriminatory reason as unbelievable." (citing *Raad*, 323 F.3d at 1193-94)). "Disputing only one of several well-supported, independently sufficient reasons for termination is generally not enough to defeat summary judgment." *Curley v. City of N. Las Vegas*, 772 F.3d 629, 633 (9th Cir. 2014) (citing *Cotton v. City of Alameda*, 812 F.2d 1245, 1248

---

[28] Accordingly, the Court denies Gleason's motion in the alternative for a finding that Defendants failed as a matter of law to articulate legitimate, non-discriminatory reasons for her termination. (*See* Pl.'s Mot. at 2, 11, 17.)

[29] The parties dispute whether Defendants properly proffered a fourth, non-discriminatory basis for Gleason's termination: a client's request to remove Gleason as a point of contact on one account. (*See* Defs.' Resp. at 12; Pl.'s Reply at 2-3, 16-18.) The Court need not resolve the parties' dispute because it does not rely on that fourth basis herein.

(9th Cir. 1987) and *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1309 (10th Cir. 2005)). The Court "must consider whether a genuine issue exists with respect to the credibility of each of the employer's proffered explanations." *Cotton*, 812 F.2d at 1248.

Even viewing the evidence in the light most favorable to Gleason, Gleason has not satisfied her burden of demonstrating that Defendants' reasons for her termination were pretextual.

First, Gleason argues that reliance on her conflict with colleagues is pretextual because Ryan did not know the specifics about the "issues" and because there is no "evidence supporting any of [Gleason's coworkers'] allegations against Ms. Gleason." (Pl.'s Mot. at 6-7, 14-15.) The question is not whether the justification for termination could be proven false but whether the decision-maker honestly believed in the justification. *See Whitley v. City of Portland*, 654 F. Supp. 2d 1194, 1220 (D. Or. 2009) (explaining that "an employer's reliance on its subjective belief is not pretextual . . . [and] 'it is not important whether the[ justifications] were *objectively false*'" (quoting *Villiarimo*, 281 F.3d at 1063)). Accordingly, the Court disagrees that the proffered reason is pretextual without evidence proving Gleason's coworkers' allegations. The Court further disagrees that Ryan's knowledge of the general conflict but lack of recollection of specific details suggests discriminatory motive.[30] Gleason has "presented no evidence that [Ryan] did not honestly believe [her] proffered reasons." *Villiarimo*, 281 F.3d at 1063; (*see* Ryan Dep. 52:5-21, describing that the trio had "issues with communication" and "challenges with crossing into one another's roles which, in turn, impact[ed] the client").

///

---

[30] The parties dispute the import of Gaughran's knowledge of the details of the conflict. (*See* Defs.' Resp. at 8-9; Pl.'s Reply at 5-7, 13-14.) The Court need not resolve the parties' dispute because it does not rely on that potion of Gaughran's testimony herein.

Second, Gleason argues that she returned to work on April 17, 2023, and therefore she was not on leave when she emailed a client. (Pl.'s Mot. at 15.) Further, she argues that she did not subsequently email clients after Ryan instructed her not to. (*Id.*) The evidence reveals that on March 29, 2023, Ryan told Gleason not to work while on a leave of absence. (Gleason Decl. Ex. J at 9.) On April 18, 2023, Gleason emailed Ryan suggesting that she would remain on leave through April 28, 2023, but that she had begun working on client emails the day before. (*Id.* at 3.) Gleason appears to argue that Ryan should have understood Gleason's email to mean that her return-to-work date was April 17, 2023.[31] (*See* Pl.'s Mot. at 15.) Again, the question is not whether Gleason's perspective is objectively correct but whether the decision-maker honestly believed in the justification. *See Whitley*, 654 F. Supp. 2d at 1219-20. Gleason has "presented no evidence that [Ryan] did not honestly believe [her] proffered reasons." *Villiarimo*, 281 F.3d at 1063; (*see* Ryan Decl. Ex. 2 at 3, April 20, 2023, email from Ryan stating that Gleason had indicated that she would be on leave through April 28, 2023; Ryan Dep. 100:10-24, explaining that Gleason stated on April 18 that she was working "ahead of when she was intending to return to work").

Third, Gleason argues that she did not fail to follow leave protocol. (Pl.'s Mot. at 9-10, 15-17.) She asserts that she did not intend to take medical leave so did not need to contact Lincoln Financial and, even if she did want to take medical leave, she had thirty days from the start of her leave to do so. (*Id.* at 9-10.) However, Gleason's emails suggested to Ryan that Gleason did intend to take medical leave. (*See* Gleason Decl. Ex. J at 11, 17, "I have a series of

---

[31] Gleason asserts that Ryan "conceded" that Gleason "was not out on leave at the time[.]" (Pl.'s Mot. at 15, citing Ryan Dep. 91:25-92:4.) Similarly, Gleason argues that Ryan's instruction not to contact clients while on unapproved leave "was contrary to Defendants' policies." (*Id.* at 9; Ryan Dep. 94:22-24.) The cited portions of Ryan's deposition do not support those assertions.

invasive medical procedures over the next few weeks, so starting tomorrow, I'm going to be taking 4 weeks of my sick leave to address the issues with my heart and take the time to recover[,]" and "I had to go to the hospital on Friday the 17 via ambulance due to extreme chest pain. Today is my first day not on serious pain medication.") Further, Gleason's leave started on March 16, 2023, and there is no evidence that she had contacted Lincoln Financial within the thirty-day window as of April 24, 2023, the date of her termination.

Gleason argues that a combination of sick and safe leave and her unlimited amount of flexible time off covered her absence and that she received approval for her absence from Workday. (Pl.'s Mot. at 9-10.) The record reveals that Gleason only had forty-eight hours of sick leave remaining for the year. (*See* Gleason Decl. Ex. J. at 11; Second Kendall Decl. Ex. 4 at 3, ECF No. 88-1.) Gleason argues that she received approval for her leave through Workday. (Pl.'s Mot. at 10.) Yet Ryan explained in her email exchange that the Workday approval was autogenerated when the benefits team referred Gleason to Lincoln Financial. (Gleason Decl. Ex. J at 1.) Again, Gleason has "presented no evidence that [Ryan] did not honestly believe [her] proffered reasons." *Villiarimo*, 281 F.3d at 1063. For example, Gleason has not presented evidence that she received the approval from Workday *before* she left on leave and that Ryan had record of that approval. (*Cf.* Second Gleason Dep. 151:17-19, conceding that, according to Ryan, her time off had not been approved.)

Gleason also argues that Defendants' failure to investigate her report of retaliation suggests that the reasons for her termination were pretextual. (*But see* Ryan Dep. 29:19-30:14, 79:3-9, explaining that Dentsu's policy in response to reports of concern "is to alert [Dentsu's] employee relations team and work with them to investigate the complaint" and that Ryan *did* notify the employee relations team of Gleason's report of retaliation); *see also Gunzenhauser v.*

*Garland*, No. 3:22-cv-03406-WHO, 2024 WL 1120385, at *6 (N.D. Cal. Mar. 14, 2024)

("'[D]eviations from protocol and procedural irregularities may give rise to an inference of

pretext' under the *McDonnell Douglas* test . . . ." (quoting *Bonillas v. United Air Lines, Inc.*, No.

12-cv-6574 SBA, 2014 WL 4087906, at *9 (N.D. Cal. Aug. 19, 2014) and citing *Earl v. Nielson*

*Media Research, Inc.*, 658 F.3d 1108, 1117 (9th Cir. 2011))).

The Court concludes that there is no direct evidence of retaliatory motive and Gleason's

suggestion that Defendants did not investigate her report of retaliation does not satisfy her

burden of showing pretext. *See Wallis*, 26 F.3d at 890 ("In response to the defendant's offer of

nondiscriminatory reasons, the plaintiff must produce 'specific, substantial evidence of pretext.'"

(quoting *Steckl v. Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir. 1983))); *Butler v. City of Eugene*,

*Or.*, 707 F. Supp. 2d 1100, 1108 (D. Or. 2010) ("Plaintiff has not produced enough evidence to

allow a reasonable fact finder to conclude either (a) that the alleged reasons for the adverse

employment decisions were false, or (b) that the true reasons for the adverse employment

decisions were improper ones. As such, plaintiff has not satisfied his burden, and cannot survive

summary judgment." (citing *Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 918 (9th Cir.

1997))).

Accordingly, the Court grants Defendants' motion for summary judgment based on

Gleason's termination theory of retaliation and denies Gleason's partial motion for summary

judgment. *See Villiarimo*, 281 F.3d at 1063 (affirming grant of summary judgment where the

district court found that the plaintiff had "not shown that the reasons [the defendant] offers for

her termination are pretextual"); *Flanagan v. City of Richmond*, No. 14-cv-02714-EMC, 2015

WL 5964881, at *17 (N.D. Cal. Oct. 13, 2015) ("[T]here is no evidence that Plaintiff was

intentionally terminated for her [protected status], rather than Defendants' honestly-held belief that she violated the rules of conduct."), *aff'd*, 692 F. App'x 490 (9th Cir. 2017).

## CONCLUSION

For the reasons stated, the Court DENIES Gleason's motion for partial summary judgment (ECF No. 66), and GRANTS IN PART and DENIES IN PART Defendants' motion for summary judgment (ECF No. 69) as follows:

- GRANTS:
  - Defendants' motion for summary judgment on Gleason's EPA retaliation claim (claim two), Title VII retaliation claim (claim four), and Oregon Revised Statutes § 659A.030 retaliation claim (claim six).

- DENIES:
  - Defendants' motion for summary judgment on Gleason's EPA wage discrimination claim (claim one), Title VII wage discrimination claim (claim three), OEPA wage discrimination claim (claim five), and failure to pay wages upon termination claim (claim seven).

The Court also dismisses Gleason's claims against Dentsu UK for lack of personal jurisdiction.

**IT IS SO ORDERED.**

DATED this 14th day of June, 2024.

s/ Stacie F. Beckerman
HON. STACIE F. BECKERMAN
United States Magistrate Judge
